UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CANAL+ IMAGE UK Ltd.,                     :

              Plaintiff,            :

      -against-                         :
                              Case No. 10 CV 1536
STEVEN LUTVAK and ROBERT L.             :
FREEDMAN,                                 Holwell, J.
                         :

         Defendants.               :

                         :

                         :
-------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

                                         LOEB & LOEB LLP
                                         Barry I. Slotnick (BS-9796)
                                         Jonathan Neil Strauss (JS-1090)
                                         345 Park Avenue
                                         New York, New York 10154-1895
                                         (212) 407-4000

TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................. 3

I.     Summary of the Works at Issue ............................................................ 3

A.    The Novel, Israel Rank ...................................................................... 3

B.    The Film, Kind Hearts and Coronets ................................................. 5

C.    The Musical, A Gentleman's Guide to Love and Murder .................... 7

II.    The Agreement ................................................................................... 9

I.     PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIMS SHOULD BE
DISMISSED BECAUSE THERE IS NO SUBSTANTIAL SIMILARITY
BETWEEN THE MUSICAL AND THE COPYRIGHTABLE ELEMENTS
OF PLAINTIFF'S WORK ..................................................................... 10

    A.    Elements of the Public Domain Novel Israel Rank That are
Incorporated Into Kind Hearts Are Not Protectible, and Defendants Are
Free to Utilize Such Elements in Gentleman's Guide ......................... 12

    B.    The Nonprotectible Ideas Identified in Plaintiff's Complaint Do Not
Give Rise to An dInfringement Claim ............................................... 15

        1.    Plaintiff Cannot Copyright the Idea of Adapting Israel Rank in
a Humorous Manner ............................................................... 15

        2.    The Theatrical Device of One Actor Playing Multiple Roles is
Not Protectible, and Does Not Give Rise to a Claim of
Infringement .......................................................................... 18

    C.    With the Unprotectible Elements Removed from Consideration,
Gentleman's Guide is Not Substantially Similar to Kind Hearts as a
Matter of Law ................................................................................ 21

        1.    "Total Concept and Feel" and Theme .................................... 21

        2.    Characters ............................................................................ 23

        3.    Plot, Sequence of Events and Setting .................................... 25

        4.    Pace .................................................................................... 26

II.    PLAINTIFF'S BREACH OF CONTRACT CLAIM MUST ALSO BE
DISMISSED .................................................................................... 27

Table of Contents

Page

A.    Plaintiff's Breach of Contract Claim is Preempted by the United States
      Copyright Act..........................................................................................................27

B.    Any Claim that Defendants Are Barred From Including in The Musical
      Non-Protectible Elements of *Kind Hearts* That Are Not Owned by
      Plaintiff is Contrary to the Plain Terms of the Agreement ................................29

CONCLUSION...................................................................................................................33

TABLE OF AUTHORITIES

Page(s)

CASES

*A Slice of Pie Prods., LLC v. Wayans Bros. Entm't,*
    487 F. Supp. 2d 41 (D. Conn. 2007)...............................................................................19-20

*Alexander v. Haley,*
    460 F. Supp. 40, 45 (S.D.N.Y. 1978)...................................................................................13

*Am. Movie Classics Co. v. Turner Entm't Co.,*
    922 F. Supp. 926 (S.D.N.Y. 1996) .......................................................................................28

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,*
    373 F.3d 296 (2d cir. 2004) .............................................................................................28-29

*Brignoli v. Balch Hardy and Scheinman, Inc.,*
    645 F. Supp. 1201 (S.D.N.Y.1986)......................................................................................28

*BroadVision Inc. v. Gen. Elec. Co.,*
    No. 08 Civ.1489(WHP), 2008 WL 4684114 (S.D.N.Y. October 15, 2008)...........................28

*Brooke Group v. JCH Syndicate 488,*
    87 N.Y.2d 530, 640 N.Y.S.2d 479 (1996) ...........................................................................30

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
    683 F.2d 610 (2d Cir. 1982)................................................................................................26

*Cabell v. Sony Pictures Ent't, Inc.,*
    09 Civ. 1610 (WHP), 2010 WL 2131771 (S.D.N.Y. May 25, 2010) ....................................13

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002).................................................................................................3

*Chappell & Co. v. Fields,*
    210 F. 864 (2d Cir. 1914)...................................................................................................20

*Computer Assocs. Int'l, Inc. v. Altai, Inc.,*
    982 F.2d 693 (2d Cir. 1992)................................................................................................12

*Conan Properties, Inc. v. Mattel, Inc.,*
    712 F. Supp. 353 (S.D.N.Y. 1989) ......................................................................................14

*Earth Flag Ltd. v. Alamo Flag Co.,*
    153 F. Supp. 2d 349 (S.D.N.Y. 2001)..................................................................................16

*Faulkner v. Nat'l Geographic Soc'y,*
    211 F. Supp. 2d 450 (S.D.N.Y. 2002), *modified,* 220 F. Supp. 2d 237 (S.D.N.Y.
    2002), *aff'd,* 409 F.3d 26 (2d Cir. 2005)...........................................................................12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)..................................................................................................10

*Filmvideo Releasing Corp. v. Hastings*,
    668 F.2d 91 (2d Cir. 1981)......................................................................................12

*First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y*,
    43 Fed. Appx. 462 (2d Cir. 2002).........................................................................29

*Fisher Price, Inc. v. Well-Made Toy Mfg., Corp.*,
    25 F.3d 119 (2d Cir. 1994)................................................................................ 10-11

*Flaherty v. Filardi*,
    388 F. Supp. 2d 274 (S.D.N.Y. 2005)....................................................................11

*Gal v. Viacom Int'l, Inc.*,
    403 F. Supp. 2d 294 (S.D.N.Y. 2005)....................................................................11

*Gal v. Viacom Int'l, Inc.*,
    518 F. Supp. 2d 526 (S.D.N.Y. 2007)...................................................................20

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
    590 F. Supp. 2d 625 (S.D.N.Y. 2008)......................................................................3

*Green v. Lindsey*,
    885 F. Supp. 469 (S.D.N.Y. 1992), *aff'd*, 9 F.3d 1537 (2d Cir. 1993) ...................21

*Jofen v. Epoch Biosciences*,
    No. 01 Civ. 4129 (JGK), 2002 WL 1461351 (S.D.N.Y. Jul. 8, 2002), *aff'd*, 62 Fed.
    App'x 410 (2d Cir. 2003).......................................................................................27

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*,
    945 F.2d 509 (2d Cir. 1991)....................................................................................10

*Kregos v. Associated Press*,
    3 F.3d 656 (2d Cir. 1993).......................................................................................27

*Lasercomb America, Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990) ............................................................................. 31-32

*Lewinson v. Henry Holt and Co.*,
    659 F. Supp. 2d 547 (S.D.N.Y. 2009)..........................................................Passim

*Mallery v. NBC Universal, Inc.*,
    2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ........................................................11

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
    244 F.R.D. 204 (S.D.N.Y. 2007) ...........................................................................27

*Mazzola v. Cty. of Suffolk,*
   143 A.D.2d 734, 533 N.Y.S.2d 297 (2d Dep't 1988) ............................................................30

*Montz v. Pilgrim Films & Television, Inc.,*
   No. 08-56954, 2010 WL 2197421 (9th Cir. June 3, 2010) ....................................................29

*Muzak Corp. v. Hotel Taft Corp.,*
   1 N.Y.2d 42, 150 N.Y.S.2d 171 (1956) ................................................................................30

*N.L.R.B. v. Local 32B-32J Serv. Employees Int'l Union,*
   353 F.3d 197 (2d Cir. 2003) ..................................................................................................32

*Pannonia Farms, Inc. v. USA Cable,*
   No. 03 Civ. 7841, 2004 WL 1276842 (S.D.N.Y. June 8, 2004) .....................................13, 23

*Peter F. Gaito Architecture, LLC v. Simone Dev.Corp.,*
   602 F.3d 57 (2d Cir. 2010) ..............................................................................................10, 11

*Porto v. Guirgis,*
   659 F. Supp. 2d 597 (S.D.N.Y. 2009) ........................................................................... Passim

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,*
   121 F.3d 516 (9th Cir. 1997) .................................................................................................32

*Price v. Fox Entm't Group, Inc.,*
   473 F. Supp. 2d 446 (S.D.N.Y. 2007) ..............................................................................27-28

*Psihoyos v. Nat'l Geographic Soc'y,*
   409 F. Supp. 2d 268 (S.D.N.Y. 2005) ..............................................................................21-22

*Radio Today, Inc. v. Westwood One, Inc.,*
   684 F. Supp. 68 (S.D.N.Y. 1988) ..........................................................................................31

*Reyher v. Children's Television Workshop,*
   533 F.2d 87 (2d Cir. 1976) ...............................................................................................16-17

*Rice v. Hartford Life and Accident Ins. Co.,*
   No. 5:08-CV-00347 ................................................................................................................32

*Robinson v. Viacom Int'l, Inc.,*
   No. 93 Civ. 2539, 1995 WL 417076 (S.D.N.Y. July 13, 1995) .............................................26

*Schloss v. Sweeney,*
   515 F. Supp. 2d 1068 (N.D. Cal. 2007) ................................................................................32

*Selby v. New Line Cinema Corp.,*
   96 F. Supp. 2d 1053 (C.D. Cal. 2000) ..................................................................................29

*Shaw v. Lindheim,*
    809 F. Supp. 1393 (C.D. Cal. 1992) ............................................................... 14-15

*Silverman v. CBS Inc.,*
    870 F.2d 40 (2d Cir. 1989)................................................................... 12-13, 23

*Tamburo v. Calvin,*
    No. 94 C 5206, 1995 WL 121539 (N.D. Ill. Mar. 17, 1995) ..................................... 32

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,*
    155 F. Supp. 2d 1 (S.D.N.Y. 2001), *aff'd in part, rev'd in part on other grounds,* 277
    F.3d 253 (2d Cir. 2002).......................................................................... 20

*Walker v. Time Life Films, Inc.,*
    615 F. Supp. 430 (S.D.N.Y. 1985), *aff'd,* 784 F.2d 44 (2d Cir. 1986) ...................... 20

*Walker v. Time Life Films, Inc.,*
    784 F.2d 44 (2d Cir. 1986)................................................................... 11, 15

*Warner Bros. Inc. v. Am Broad. Cos.,*
    720 F.2d 231 (2d Cir. 1983).................................................................... 21

*Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.,*
    111 F. Supp. 2d 450 (S.D.N.Y. 2000)............................................................ 30

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996)..................................................... 10, 11, 15,16, 26

*Willis v. Home Box Office,*
    00 Civ. 2500 (JSM), 2001 WL 1352916 (S.D.N.Y. Nov. 2, 2001), *aff'd,* 57 Fed.
    App'x 902 (2d Cir. 2003)....................................................................... 19

## STATUTES

17 U.S.C. § 102(b) ................................................................................ 15

17 U.S.C. § 103(b) ................................................................................ 12

17 U.S.C. § 301................................................................................... 28

Copyright Act, Pub. L. No. 60-349, 35 Stat. 1075, 1077 ........................................... 12

## OTHER AUTHORITIES

*American Heritage College Dictionary* at 1168 (3d ed. 1997)...................................... 30

*Black's Law Dictionary* at 916 (6th ed. 1991) ................................................... 30

Fed. R. Civ. P. 12(b)(6).......................................................................... 1

Fed. R. Civ. P. 56 ................................................................................................................1

1 Nimmer on Copyright § 3.04[A] at 3-20.14 (2003).............................................12, 21

Introduction to Greek Tragedy, http://ablemedia.com/ctcweb/netshots/tragedy.htm....................19

Dual Role, Wikipedia, http://en.wikipedia.org/wiki/Dual_role.....................................................20

List of actors who have played multiple roles in the same film, Wikipedia,
http://en.wikipedia.org/wiki/List_of_actors_who_have_played_multiple_roles_in_the_sa
me_film ................................................................................................................................20

Little Me (Musical), Wikipedia, http://en.wikipedia.org/wiki/Little_Me_%28musical%29 ........20

Amazon, http://www.amazon.com/Israel-Rank-Autobiography-Roy-
Horniman/dp/057124548X ..........................................................................................................16

Defendants Steven Lutvak and Robert L. Freedman (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), for an order dismissing the Complaint of plaintiff Canal+ Image UK Ltd. ("Plaintiff") for failure to state a cognizable claim of relief.  In the alternative, Defendants respectfully request that the Court grant them summary judgment, pursuant to Fed. R. Civ. P. 56, dismissing Plaintiff's Complaint in its entirety.

## PRELIMINARY STATEMENT

Plaintiff – owner of the copyright in the film *Kind Hearts and Coronets* ("*Kind Hearts*" or the "Film"), a derivative work based on the public domain novel *Israel Rank:   The Autobiography of a Criminal* ("*Israel Rank*" or the "Novel) – has sued to prevent Defendants from creating their own adaptation of the Novel.  In short, Plaintiff seeks to assert monopolistic control over a work that Plaintiff did not create, and which is indisputably in the public domain.

It is a fundamental principle of copyright law that the copyright in a derivative work such as *Kind Hearts* extends only to embellishments and additions original to the derivative work, and that such a copyright does not protect or imply any rights in the pre-existing material incorporated into the derivative work.  Accordingly, Plaintiff has no claim of ownership over any elements of the public domain Novel, and Defendants are free to create their own adaptation of that work.

Plaintiff's copyright infringement claim must fail because, as a matter of law, there is no substantial similarity between Defendants' musical play, titled *A Gentleman's Guide to Love and Murder* ("*Gentleman's Guide*" or the "Musical") and the <u>protectible</u> elements of *Kind Hearts*, *i.e.*, those elements that are original and unique to the Film.  Indeed, Plaintiff's Complaint fails to identify any specific similarities between *Gentleman's Guide* and any original elements of *Kind Hearts*, other than the non-copyrightable ideas of creating a "humorous" adaptation of *Israel*

1

*Rank*, and a casting decision to have one actor play multiple roles. Such ideas, as well as sequences of events that flow naturally from them, are not subject to copyright protection.

Setting aside Plaintiff's pleading failures, there are simply no legally cognizable similarities between *Gentleman's Guide* and any original, protectible elements of *Kind Hearts*. Accordingly, Plaintiff's copyright infringement claim must be dismissed as a matter of law.

Plaintiff's breach of contract claim (a copyright claim cloaked in contract array) also should be dismissed. Simply stated, Plaintiff claims that Defendants "breached" the agreement between Plaintiff and Mr. Lutvak by copying the Film. As such, Plaintiff's breach of contract claim seeks to protect rights that are protected exclusively under copyright law, and therefore is preempted by the Copyright Act. In addition, to the extent Plaintiff contends that the agreement in question prevents Defendants from utilizing even those elements of the Film derived from *Israel Rank*, which Plaintiff does not own, that argument is foreclosed by the plain language of the agreement, which only purports to convey and protect the limited elements of the Film actually owned by Plaintiff. Following the termination of the agreement, Defendants remain free to do that which they were entitled to do all along – create an adaptation of the public domain novel *Israel Rank*, so long as their adaptation does not copy any elements of *Kind Hearts* protected by Plaintiff's copyright.

## STATEMENT OF FACTS

The facts set forth herein are taken from the Complaint (the allegations of which are presumed to be true solely for purposes of this motion), and from documents incorporated by reference in or integral to the Complaint, including the various works at issue.[1]

### I.    Summary of the Works at Issue

Unlike the typical copyright infringement action, which requires comparison of only the original and the allegedly infringing works, the present case requires comparison of three works: *Israel Rank*, a 1907 novel by Roy Horniman (Slotnick Decl. Ex. A (hereinafter, "Novel")); *Kind Hearts*, Plaintiff's copyrighted motion picture, which is a derivative work based on *Israel Rank* (Compl. ¶¶ 7, 15; Slotnick Decl. Ex. B (hereinafter "Film"); and *Gentleman's Guide*, a musical stage adaptation of *Israel Rank* (Slotnick Decl. Ex. C (hereinafter "Musical").[2]

### A.    The Novel, *Israel Rank*

*Israel Rank* is a black comic-thriller, set in Edwardian England, about a charming outsider, half-Jewish and distantly related to a noble family, who embarks on a plot to murder those members of the family who stand between him and an earldom.  As is plain from its full title, *Israel Rank: The Autobiography of a Criminal* (Slotnick Decl. Ex. F), the novel is in the form of the protagonist's memoirs, written in prison after he has been sentenced to death for killing his final victim.  (*See, e.g.*, Novel at 49, 57-59, 306-09).

---

[1] On a motion to dismiss a copyright infringement claim based on lack of "substantial similarity", the Court may consider documents attached to the complaint or incorporated in it by reference, as well as documents "integral" to the complaint and relied upon in it.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 629-30 n.1 (S.D.N.Y. 2008).  Accordingly, the following materials are annexed to the accompanying Declaration of Barry I. Slotnick:  The novel *Israel Rank*; the script for *Gentleman's Guide* and a CD containing a recording of *Gentleman's Guide's* musical elements; the film *Kind Hearts*; and the agreement between Plaintiff and defendant Steven Lutvak.

[2] References to "Slotnick Decl." are to the July 2, 2010 Declaration of Barry I. Slotnick, submitted herewith.

The early part of the Novel focuses on Israel's childhood and youth, and introduces, among others, the key character of Sibella Hallward, Israel's social-climbing first love, who spurns Israel for his far wealthier romantic rival, Lionel Holland. (*Id.* at 18-46). In the Novel, Israel is aware from childhood of his connection to the noble family, the Gascoynes, and (without his mother's knowledge) writes to Gascoyne Gascoyne, the head of a large stockbroking firm, asking for a job. He is rudely rebuffed. (*Id.* at 46).

Israel begins to conceive the idea of murdering all Gascoynes who precede him in the line of succession, a plan which crystallizes following a visit, as a tourist, to Hammerton, the Gascoyne family estate and castle. (*Id.* at 57-69). Israel's first victims are Gascoyne Gascoyne Jr., the son of the stockbroker who refused Israel a job, and Gascoyne's showgirl mistress. (*Id.* at 70-80). Shortly afterwards, Israel surprisingly receives a letter from Gascoyne Sr., who apologizes for his previous rudeness and offers Israel a job. (*Id.* at 81-85). The elder Gascoyne becomes Israel's employer and father figure until his death (of natural causes) towards the end of the Novel.

The middle portion of the Novel concerns two major plot elements; Israel's continued elimination of Gascoynes who precede him in the line of succession, and Israel's love for two women – Sibella and Edith Gascoyne (the sister of his second victim). Israel's next three victims are, in order, Henry Gascoyne (a lazy, dilettante country dweller largely cared for by his sister, Edith) (*id.* at 89-90, 100-11, 120, 128), Ughtred Gascoyne (a middle-aged bachelor) (*id.* at 155-56, 168-74), and the Reverend Henry Gascoyne (an aging drunk) (*id.* at 195, 225-26). With respect to his love life, Israel learns that Sibella has become engaged to Lionel Holland. (*Id.* at 88-89). However, Sibella looks upon Israel with new interest in light of his upward mobility, and begins an affair with him shortly before her marriage. (*Id.* at 90-98, 149-52). Israel also

falls in love with Edith, and (despite continuing his affair with Sibella) asks her to marry him. She says yes. (*Id.* at 116, 178-91, 206-08, 226).

In the final portion of the Novel, with only a few lives standing between him and the earldom, Israel sets his sights on Lord Simeon Gascoyne, Earl of Hammerton, and his infant son. His social standing having increased dramatically, Israel is invited to visit Hammerton, where he fatally infects the Earl's son with smallpox. (*Id.* at 234-58). After learning that his employer suffers from a heart ailment (*id.* at 258-59) and marrying Edith (*id.* at 260), Israel successfully poisons the Earl (*id.* at 268).

Israel's sloppiness leads to his being arrested for his final murder. (*Id.* at 290). While Israel is in prison, his employer (the new Earl) passes away due to his heart malady, and Israel becomes the Earl of Hammerton. (*Id.* at 294). Israel is found guilty and sentenced to death, after which he begins writing his memoirs. (*Id.* at 304-09). Israel is ultimately exonerated when a governess at the castle, who had fallen in love with him, falsely confesses to murdering the Earl, and takes her own life in order to save Israel's. (*Id.* at 311-12). The novel ends with Israel reflecting on the two women – Edith and Sibella – whom he continues to love. (*Id.* at 312).

B.    **The Film, *Kind Hearts and Coronets***

*Kind Hearts* incorporates significant plot elements and characters from *Israel Rank*, but also makes a number of changes. Among other things, the entire final third of the Film differs significantly from the Novel.

*Kind Hearts* retains the Novel's underlying conceit – that the story is being told through the protagonist's memoirs – establishing such conceit by setting the second scene in prison, where the protagonist (now named Louis Mazzini) is penning his memoirs following his murder conviction, and telling the remainder of the story via flashback. (Film at 4:59 – 6:53).

5

As in the Novel, *Kind Hearts* begins with Louis' childhood and young adulthood, and introduces the key characters of Sibella and Lionel.  As in the Novel, Louis is aware since childhood of his connection to the noble family (now named the D'Ascoynes).  In the Film, it is Louis' mother who writes to Ascoyne D'Ascoyne, a banker, seeking employment for her son, but, as in the Novel, he is rudely rebuffed.  (*Id.* at 6:53 – 20:37).

Also as in the Novel, Louis resolves to murder his way up the line of succession, and Louis' first victims are Ascoyne D'Ascoyne Jr. and his mistress.  (*Id.* at 20:15 – 26:47).  Unlike in the Novel, in which Israel is surprised to receive a letter from his first victim's father, in the Film Louis actively schemes to ingratiate himself with Ascoyne Sr. by writing a letter of condolence, after which the elder Ascoyne offers Louis employment and becomes his benefactor. (*Id.* at 26:49 – 28:26).

Like the Novel, *Kind Hearts* next focuses on the continued murders and Louis' relationships with Sibella and Edith (though, in a significant departure, Edith is now the widow, not the sister, of Louis' second victim).  (*Id.* at 28:27 – 30:15; 33:18 – 34:02; 43:38 – 45:30). *Kind Hearts* retains the characters of Henry and the Reverend as murder victims (*id.* at 30:30 – 33:16; 38:49 – 41:07; 50:23 – 56:42), and adds three new characters – Lady Agatha, Admiral Lord Horatio, and General Lord Rufus – who are killed in quick succession (though the Admiral dies in a naval accident, not at Louis' hand).  (*Id.* at 56:43 -- 1:00:27).  During this time, Louis begins an affair with Sibella prior to her marriage to Lionel, yet proposes to Edith (who eventually accepts).  (*Id.* at 36:44 – 38:48; 46:45 – 50:21; 1:02:24 – 1:11:21).

The remainder of *Kind Hearts* departs significantly from the Novel.  Sibella lies that Lionel has discovered the affair, and tries to blackmail Louis into marrying her.  (*Id.* at 1:11:22 – 1:19:05).  Louis murders the Duke of Chalfont, and becomes Duke after his employer dies of shock, but is then arrested for the murder of Lionel Holland (who actually had committed

suicide). (*Id.* at 1:19:06 – 1:29:56). Louis is convicted based on Sibella's lies, but Sibella subsequently visits him in prison and implies that she will present Lionel's "missing" suicide note if he agrees to kill Edith (whom he had married during the course of the trial) and marry her. Louis agrees, but suggests in a voiceover that he might choose to dispatch of Sibella instead. (*Id.* at 1:29:56 – 1:41:18).

The Film ends with Louis leaving prison, but suddenly recalling with shock that he left his memoirs – in which he confessed all of his crimes – in his cell. As the music rises and the camera zooms in on the incriminating memoirs, it is strongly implied that Louis' crimes will be discovered after all. (*Id.* at 1:43:47 – End).[3]

C.   **The Musical, *A Gentleman's Guide to Love and Murder***

*Gentleman's Guide* also incorporates significant plot elements and characters from *Israel Rank*, and also makes a number of changes as a result of the different medium, not least of which is the addition of numerous original songs and related musical elements.

*Gentleman's Guide* sets the tone with an opening number from the D'Ysquith Ancestors "warning" weak-of-heart audience members to avoid the "chilling" production. As in the Novel, the story is relayed in the form of the protagonist's – now named Monty Navarro – memoirs, written from prison. To establish this conceit, the first scene shows Monty writing his memoirs in prison (*see* Musical at 1-3), and frequent interstitials throughout the musical show Monty narrating the action from his prison cell.[4]

Unlike *Kind Hearts*, *Gentleman's Guide* skips past Monty's childhood, beginning his story as an adult. Also unlike in *Kind Hearts*, in which Louis' mother was fixated on the

---

[3] The version of the Film originally released in America contains an altered ending, which makes explicit that Louis' crimes are discovered. (*See* Film, American Ending).

[4] The conversation between Monty and a young barber at the beginning of *Gentleman's Guide*, like many other scenes in the Musical, is taken directly from *Israel Rank*. (*See* Novel at 304).

7

D'Ascoynes and impressed upon Louis his place in the line of succession from a young age, in the Musical Monty does not learn of his relation to the noble family, now called the D'Ysquiths, until after his mother's death. (*Id.* at 4-10).

As in the Novel, Monty writes to Lord Asquith D'Ysquith, a stockbroker, requesting a job (and is later rebuffed). (*Id.* at 10, 14-15). In the next scene, the central character of Sibella Hallward is introduced. As in *Israel Rank*, Sibella is a social-climber and chooses Lionel Holland over Monty due to Lionel's wealth and prospects. (*Id.* at 10-16). However, Lionel, an important character in the Film, is referenced but never appears in the Musical.

In a departure from both *Israel Rank* and *Kind Hearts*, Monty "kills" his first victim in unpremeditated fashion, allowing the reverend to fall from a belfry after losing his balance. (*Id.* at 21-24). Monty then begins his plot in earnest, starting with Asquith D'Ysquith Jr. and his mistress. As in the Novel (and unlike the Film), soon after dispatching of young Asquith, Monty is surprised to receive a letter from his victim's father, who apologizes for his previous rudeness and offers Monty a job. (*Id.* at 25-34).

*Gentleman's Guide* retains the character of the next murder victim – Henry D'Ysquith – from the Novel. (*Id.* at 37-49). The remaining murder victims – Lady Hyacinth, Lord Bartholemew and Lady Salome – are original characters, appearing in neither *Israel Rank* nor *Kind Hearts*. (*Id.* at 49-52, 55-58, 59-60, 78). As in *Israel Rank*, Monty's employer dies of a heart attack, although this death occurs earlier in *Gentleman's Guide* than it does in either *Israel Rank* or *Kind Hearts*. (*Id.* at 63).

Unlike both the Novel and the Film, Monty does not begin his affair with Sibella until after her wedding. (*Id.* at 54-55). Monty's other love interest in the Musical is Phoebe D'Ysquith (who is Henry's sister, as in the Novel, and not his widow, as in the Film). (*Id.* at 45-

8

48, 58-59).  In another departure from the preceding works, in *Gentleman's Guide* it is Phoebe who proposes to Monty, rather than the other way around.  (*Id.* at 70-77).

The final eight scenes are original to the Musical.  (*Id.* at 78-107).  Monty and Phoebe visit the Earl and his wife at Highhurst Castle, where Sibella coincidentally is also a guest.  In a comic scene, Monty tries, and fails, to murder Lord Adalbert via poisoned trifle, but the Earl drops dead despite never eating the poisoned dish.  (*Id.* at 79-91).  (At the end of the play it is revealed that the Earl was murdered by Miss Shingle, a character original to *Gentleman's Guide*).  Monty is arrested and tried for the murder of the Earl, but is freed before the jury's verdict comes in, after Phoebe and Sibella hatch a scheme to each accuse the other of confessing to the murder, thus creating "reasonable doubt".  (*Id.* at 92-105).  The Musical ends with Monty a free man, walking offstage with Phoebe and Sibella on each arm, but with yet another D'Ysquith ancestor (a character original to the Musical) stalking after Monty, apparently intending to murder his way to nobility just as Monty had.  (*Id.* at 95-96, 104-07).

## II.    **The Agreement**

Pursuant to an agreement dated April 1, 2003 (the "Agreement"), Plaintiff authorized defendant Steven Lutvak "to the extent of the interests of Canal+ Image UK Ltd. . . . to adapt [*Kind Hearts*] as a live stage musical presentation." (Slotnick Decl. Ex. E) (emphasis added).  Mr. Lutvak's right to actually stage a musical presentation of *Kind Hearts* was contingent upon, and subject to, Plaintiff's discretion. (Compl. ¶ 10; Slotnick Decl. Ex. E).  The Agreement further provided that, if Plaintiff failed to approve an actual staging of the play, then "all [Lutvak's] rights hereunder shall immediately terminate," and that all elements of *Kind Hearts* "shall be deemed to have reverted to" Plaintiffs. (*Id.*).

## ARGUMENT

## I.

## PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIMS SHOULD BE DISMISSED BECAUSE THERE IS NO SUBSTANTIAL SIMILARITY BETWEEN THE MUSICAL AND THE COPYRIGHTABLE ELEMENTS OF PLAINTIFF'S WORK

"To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). With respect to this second element, even if a plaintiff can establish "actual copying," this is not sufficient to impose liability – a plaintiff must demonstrate that the copying in question is <u>illegal</u> "because a substantial similarity exists between the defendant's work and the <u>protectible elements</u> of the plaintiff's." *Lewinson v. Henry Holt and Co.*, 659 F. Supp. 2d 547, 562 (S.D.N.Y. 2009) (quoting *Fisher Price, Inc. v. Well-Made Toy Mfg., Corp.*, 25 F.3d 119, 122-23 (2d Cir. 1994)) (emphasis added).[5]

The Second Circuit has held that "[w]hen we determine that a work contains both protectible and unprotectible elements, we must take care to inquire only whether the *protectible elements, standing alone*, are substantially similar." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (quotation and citation omitted) (emphasis in original).[6] In other words, even where

---

[5] Courts assessing a claim of copyright infringement on a motion to dismiss frequently assume that "actual copying" occurred, and address only the issue of whether the requisite substantial similarity exists between defendant's work and the protectible elements of plaintiff's. *See, e.g., Peter F. Gaito Architecture, LLC v. Simone Dev.Corp.*, 602 F.3d 57, 63 (2d Cir. 2010); *Lewinson*, 659 F. Supp. 2d at 562-63.

[6] *See also, e.g., Peter F. Gaito Architecture, LLC* , 602 F.3d at 66 (court "must attempt to extract the unprotectible elements from our consideration and ask whether the protectible elements, standing alone, are substantially similar") (quotation and citation omitted); *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509, 514 (2d Cir. 1991) (more discerning ordinary observer test requires a court to assess whether there "is substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed" work); *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994) ("Where, as here, we compare products that have both protectible

the works in question are similar, a court must "analyze the . . . works closely to figure out in what respects, if any, they are similar, and then determine whether . . . the similarity is to something in the original that is free for the taking." *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250, 2007 WL 4258196, at *2 (S.D.N.Y. Dec. 3, 2007) (quoting *Tufenkian Import/Export Ventures, Inc v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir.2003)), *aff'd*, 331 Fed. App'x 821 (2d Cir. 2009). If the only similarities between the works contain unprotected elements, plaintiff's case is insufficient as a matter of law. *Williams*, 84 F.3d at 588-89.

Here, Plaintiff's copyright claims fail as a matter of law because any similarity between *Kind Hearts* and *Gentleman's Guide* involves non-copyrightable elements of Plaintiff's work, particularly elements of *Kind Hearts* that are taken from the public domain novel *Israel Rank*, upon which *Gentleman's Guide* is also based. As the Second Circuit recently stated, there is ample authority that a court can, and should, dismiss a copyright infringement claim on a motion to dismiss if, after reviewing the subject works, it determines that the works are not substantially similar, or that any similarity concerns only nonprotectible elements. *Peter F. Gaito Architecture, LLC*, 602 F.3d 57, 63-64 (2d Cir. 2010); *see also, e.g., Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 304-05 (S.D.N.Y. 2005) (collecting cases).[7] Indeed, Plaintiff itself does not, and cannot, identify a single protectible element of *Kind Hearts* which is infringed by *Gentleman's Guide*.

---

and unprotectible elements, we must exclude comparison of the unprotectible elements from our application of the ordinary observer test.").

[7] In the alternative, courts may grant summary judgment prior to discovery if, based on their review of the subject works, "the similarity concerns only noncopyrightable elements of plaintiff work . . . ." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986); *see, e.g., Lewinson v. Henry Holt and Co.*, 659 F. Supp. 2d at 554-55; *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 283-84 (S.D.N.Y. 2005).

**A.**    **Elements of the Public Domain Novel *Israel Rank* That are Incorporated Into *Kind Hearts* Are Not Protectible, and Defendants Are Free to Utilize Such Elements in *Gentleman's Guide***

It is a "fundamental copyright principle . . . that a copyright affords protection only for original works of authorship and, consequently, copyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of derivative works." *Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir. 1989); *see also Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 92 (2d Cir. 1981) ("[A] derivative copyright is a good copyright only with regard to the original embellishments and additions it has made in the underlying work."); 17 U.S.C. § 103(b) ("The copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the pre-existing material employed in the work, and does not imply any exclusive right in the pre-existing material."). It is axiomatic that public domain material "is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992); 1 Nimmer on Copyright § 3.04[A] at 3-20.14 (2003) ("If the underlying work is in the public domain, a copyright in the derivative work does not render the underlying work protectible.").

It is undisputed that *Kind Hearts* is a derivative work based on the novel *Israel Rank* (Compl. ¶ 15), which has long been in the public domain.[8] Plaintiff has no claim of ownership over any elements of *Israel Rank*, and Defendants are free to make their own adaptation of the public domain Novel, even if this results in some similarity to those aspects of *Kind Hearts*

---

[8] *Israel Rank* was first published in 1907 (Slotnick Decl. Ex. A, at iv), and thus is unquestionably in the public domain whether it was first published in the United States or elsewhere. *See* Copyright Act, Pub. L. No. 60-349, 35 Stat. 1075, 1077 (1909) ("No copyright shall subsist . . . in any work which was published in this country or any foreign country prior to July 1, 1909, and has not been already copyrighted in the United States"); *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 463 (S.D.N.Y. 2002) (Copyright Act of 1909, which applied to works published prior to 1964, entitled author to initial copyright term of twenty-eight years, plus twenty-eight year renewal term), *modified*, 220 F. Supp. 2d 237 (S.D.N.Y. 2002), *aff'd*, 409 F.3d 26 (2d Cir. 2005).

which are also derived from *Israel Rank*. *Alexander v. Haley*, 460 F. Supp. 40, 45 (S.D.N.Y. 1978) ("Where common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement."); *see also Cabell v. Sony Pictures Ent't, Inc.*, 09 Civ. 1610 (WHP), 2010 WL 2131771, at *3 (S.D.N.Y. May 25, 2010) ("Where the parties' works contain a significant amount of public domain material, . . . public domain trees [must] be left out of the forest") (quoting 3 William F. Patry, Parry on Copyright § 9:137 (2008)).

The Second Circuit's decision in *Silverman* is instructive. There, plaintiff sought to produce a musical stage play based upon the characters from the well-known "Amos 'n' Andy" radio show," and sought a declaration that he was free to make use of public domain, pre-1948 radio broadcasts in his play. 870 F.2d at 43. Defendant, the owner of copyrights in scripts for post-1948 radio and television programs and audiovisual television shows, objected. The Court of Appeals determined that plaintiff was free to use the "Amos 'n' Andy" characters in his musical since they were laid out in detail in the pre-1948 scripts, which had entered the public domain. *Id.* at 50. The Court further held that defendant's copyrights in the post-1948 works "provide protection only for the increments of expression beyond what is contained in the pre-1948 radio scripts. . .." *Id.*

Similarly, the Court in *Pannonia Farms, Inc. v. USA Cable*, No. 03 Civ. 7841, 2004 WL 1276842, at *7 (S.D.N.Y. June 8, 2004) held that "the copyright in a derivative work will not protect public domain portions of an underlying work as incorporated in the derivative work." The plaintiff in that case – the self-described exclusive owner of all United States copyrights in the writings of Sir Arthur Conan Doyle – brought an infringement action over the broadcast of a television motion picture featuring Conan Doyle's "Sherlock Holmes" and "Dr. Watson" characters, notwithstanding that the vast majority (but not all) of the Sherlock Holmes stories had

already entered the public domain. *Id.* at *8. Because the Holmes and Watson characters were delineated in numerous stories that no longer possess copyright protection, the Court held that defendants were free to use those characters, and that "only the increments of expression" added by the few remaining copyrighted stories were protectible. *Id.* at *9; *see also Conan Props., Inc. v. Mattel, Inc.*, 712 F. Supp. 353, 360-61 (S.D.N.Y. 1989) (defendant, owner of rights in "Conan the Barbarian" character, which was derived from stories in the public domain, could only protect from infringement defendant's original contributions to the character).

Finally, in *Shaw v. Lindheim*, 809 F. Supp. 1393 (C.D. Cal. 1992), a California District court faced an analogous situation in which the plaintiff, the author of a pilot script for the television show *The Equalizer*, claimed that defendants copied his script to produce *The Equalizer* television series. *Id.* at 1395. However, the plaintiff's script was a derivative work based on an underlying treatment, which plaintiff never registered (a prerequisite to bringing suit for copyright infringement). *Id.* at 1398-99. The Court granted defendants' motion for summary judgment, ruling, *inter alia*, that "the <u>script</u> on which plaintiff sues does not contain protectible expression to the extent it contains elements of protectible expression contained in the <u>treatment</u> or underlying work, based on its registered 'derivative work' status." *Id.* at 1402.

The lesson of these rulings is clear – Plaintiff, having adapted a public domain work into a Film, cannot prevent others from adapting the underlying work, even if that adaptation necessarily elements of the Novel that also appear in *Kind Hearts*. Plaintiff can no more restrict Defendants from adapting *Israel Rank* because of such similarities than, for example, the author of an adaptation of Robin Hood could prevent other adapters from making a movie about a band of Merry Men who fight the Sheriff of Nottingham in Sherwood Forest. Only embellishments and additions original to *Kind Hearts* are protectible. However, as set forth below, Plaintiff has

not identified, and cannot identify, any protectible incremental additions in the film that Defendants have infringed.

**B.      The Nonprotectible Ideas Identified in Plaintiff's Complaint Do Not Give Rise to An dInfringement Claim**

It is a "'principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea.'" *Williams*, 84 F.3d at 587; *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection . . . extend to an idea. . . ."). Consequently, the Court must determine "whether the similarities shared by the work are something more than mere generalized idea[s] or themes", which are not protectible. *Walker*, 784 F.2d at 48-49 (quotation omitted).

Despite these well-settled principles, Plaintiff fails to identify any specific, concrete similarities between *Gentleman's Guide* and the original elements of *Kind Hearts*; instead, Plaintiff claims ownership over the idea of adapting *Israel Rank* in a humorous fashion, and the time-honored theatrical trope of having one actor play multiple roles.  These non-protectible ideas and casting decisions simply do not give rise to a claim of copyright infringement.

**1.      Plaintiff Cannot Copyright the Idea of Adapting *Israel Rank* in a Humorous Manner**

Plaintiff seeks a monopoly over the very idea of a humorous adaptation of *Israel Rank*, conclusorily alleging that the "total concept and feel" of *Kind Hearts* and *Gentleman's Guide* are the same because both works "are meant to be wittily entertaining," and contrasting those works with *Israel Rank* and its purportedly "horrifyingly realistic" murder scenes.  (Compl. ¶¶ 17-18). At the outset, it must be noted that Plaintiff apparently misreads *Israel Rank*, which, like the derivative works at issue, is a black comedy.  Indeed, the amazon.com product description for *Israel Rank* describes the novel as "a classic comedic novel . . . a comedy about a serial killer," and quotes one reviewer describing the novel as "light, witty, and entertaining" – virtually the

same terms that Plaintiff uses in trying to establish the Film's purportedly different tone. *See* http://www.amazon.com/Israel-Rank-Autobiography-Roy-Horniman/dp/057124548X

In any case, the concept of creating a humorous derivative work based on *Israel Rank* is a nonprotectible idea, which cannot give rise to a claim of copyright infringement. *See Williams*, 84 F.3d at 581 (story involving knowledgeable adult guide and young dinosaur enthusiasts visiting a "dinosaur zoo" held to be nonprotectible idea). *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91-92 (2d Cir. 1976), is on point. There, the plaintiff alleged similarities between two works, both of which involved the "thematic concept that to a lost child, the familiar face of the mother is the most beautiful face". *Id.* at 91-92. The Second Circuit ruled that no protectible similarity existed, holding that the identical thematic concept was a non-protectible idea. *Id.* at 92-93. Just as the underlying concept in *Reyher* was not protectible, the very idea of creating a comedic adaptation of *Israel Rank* is not subject to copyright, and cannot give rise to a claim.

*Earth Flag Ltd. v. Alamo Flag Co.*, 153 F. Supp. 2d 349 (S.D.N.Y. 2001), in which the plaintiff argued that it owned a copyright in a flag bearing a public domain photograph of the Earth and therefore could prohibit the sale of "imitation" flags bearing the same photograph, is also analogous. In that case, the plaintiff argued that it was entitled to protection not for the underlying public domain work, but for the manner in which it "presented" that work. The Court disagreed, ruling that plaintiff had no copyrightable interest in the "idea" of presenting the public domain photograph in flag form. *Id.* at 357-58. Here, Plaintiff's efforts to prevent Defendant from presenting a public domain work, the novel *Israel Rank*, in a particular form – as a comedy – must fail for the same reason.

The only purported similarity of "expression" identified by Plaintiff is that the musical "retain[s] the style and occurrence of humorous, non-realistic deaths from the Film." (Compl. ¶

16

18).  But the occurrence of humorous deaths in *Gentleman's Guide* fall comfortably within the definition of *scènes à faire*, "sequences of events that necessarily result from the choices of a setting or situation," which are not subject to copyright protection.  *Porto v. Guirgis*, 659 F. Supp. 2d 597, 611 (S.D.N.Y. 2009) (quoting *Williams*, 84 F.3d at 587, internal quotations omitted).  The portrayal of the protagonist murdering his way through the line of succession is essential to any adaptation of *Israel Rank*, and once one chooses to adapt *Israel Rank* in a humorous manner – a nonprotectible idea – by necessity the comedic aspects of those deaths will be highlighted, and the grimness downplayed.  In *Reyher*, the Second Circuit held that where two works have the same thematic concept, the resulting "similarity of events . . . may be considered *scènes à faire*, which necessarily result from identical situations," and do not give rise to a claim for copyright infringement.  533 F.2d at 92 ("[W]here a lost child is the protagonist, there is likely to be a reunion with parents.").  Here the general concept of "humorous" deaths is inherent in any comedic adaptation of *Israel Rank*, and is not subject to copyright protection.

Other than asserting that *Kind Hearts* and *Gentleman's Guide* both include "humorous, non-realistic deaths," Plaintiff does not, and cannot, identify any specific, actionable similarities in the expression in which the murders are carried out in the two works.  To the contrary, the order and manner of the deaths, and identities of the victims, are presented quite differently in the two works, and any similarities that do exist are derived entirely from the public domain Novel, in which Plaintiff possesses no protectible interest.  For example:

- In *Gentleman's Guide*, the first victim, the Reverend, dies in an unpremeditated, primarily accidental fall.  (Musical at 21-24).  By contrast, in *Israel Rank* and *Kind Hearts* the Reverend is the fourth and third victim, respectively, and in both works the protagonist intentionally murders him using poison.  (Novel at 195, 225-26; Film at 50:23 – 56:42).

- In all three works, the protagonist kills the Asquith D'Ysquith character and his mistress during their secret rendezvous at a seaside resort.  However, in *Kind Hearts* Louis kills them by unmooring their canoe, which falls over a weir (Film

17

at 21:25 – 26:48); in *Gentleman's Guide*, Monty uses his previously-established knowledge of Ferris Wheels to throw the young couple to their deaths while they are at an amusement park (Musical at 25-26, 29-32).

- In *Kind Hearts*, Henry D'Ascoyne, the second murder victim, is married to Edith (a prohibitionist from whom he hides his drinking habit), and dies in a darkroom explosion. (Film at 33:17 – 34:43, 38:50 – 41:07). But in both *Israel Rank* and *Gentleman's Guide* Henry the Phoebe/Edith character is Henry's sister, not his wife. And the Musical's method for dispatching Henry – who is stung to death while in a beekeeper's outfit – is entirely original. (Musical at 37-49).

- In *Kind Hearts*, Ascoyne D'Ascoyne Sr., Louis' employer, suffers a stroke and then dies of shock after succeeding to the dukedom. (Film at 1:07:48 – 1:08:08, 1:26:40 – 1:27:00). In both *Israel Rank* and *Gentleman's Guide*, however, this character dies of a heart attack, and only in *Gentleman's Guide* does his death precede that of the Earl. (Novel at 258-59, 294; Musical at 62-64).

- In *Kind Hearts*, Louis executes Lord Ethelred D'Ascoyne, Duke of Chalfont, point-blank with a shotgun, after confessing his crimes and motives. (Film at 1:24:25 – 1:26:30). In *Israel Rank*, the protagonist poisons the Earl. (Novel at 268). In *Gentleman's Guide*, Monty tries (and fails) to poison the Earl in a comic scene. The Earl nevertheless drops dead, later revealed to have been poisoned by Miss Shingle. (Musical at 86-91, 106-07).

- The remaining murders in *Gentleman's Guide* – of Lady Hyacinth, Lord Bartholemew, and Lady Salome – are of characters that appear in neither the Novel nor the Film, and bear no similarities to any protectible events in *Kind Hearts*. (Musical at 49-52, 55-58, 59-60, 78).

Consequently, Plaintiff's attempt to claim a copyright interest in the non-protectible idea of creating a humorous adaptation of *Israel Rank* – and in the sequences of events that flow inexorably from that idea – should be rejected as a matter of law.

### 2.   The Theatrical Device of One Actor Playing Multiple Roles is Not Protectible, and Does Not Give Rise to a Claim of Infringement

Other than the idea of "humorous deaths," the only other alleged "similarity" between *Kind Hearts* and *Gentleman's Guide* is the purportedly shared idea of having one actor portray multiple roles. (Compl. ¶ 19). However, this time-honored theatrical device is not protectible, and cannot give rise to a claim of copyright infringement.

18

Plaintiff has no protectible interest in such a non-novel theatrical device.  For example, in *Willis v. Home Box Office*, 00 Civ. 2500, 2001 WL 1352916, at *5 (S.D.N.Y. Nov. 2, 2001), *aff'd*, 57 Fed. App'x 902 (2d Cir. 2003), the plaintiff alleged that defendant stole her treatment for a television comedy based on smarmy agents, arguing, *inter alia*, that defendant's series (which was about a smarmy sports agent) copied the dramatic devices of a character who talked directly to the audience, and celebrities appearing as themselves.  Stating that "[t]here is nothing novel about either of these devices" and noting that the concept of characters speaking directly to the audience dates back to ancient Greek tragedy, the Court concluded that, even if defendant copied these devices from plaintiff's treatment, the copying of such nonprotectible elements would not give rise to a copyright violation.  *Id.*

*A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F. Supp. 2d 41 (D. Conn. 2007) involved a similar claim of copyright infringement based in part on purported copying of such dramatic devices as African American characters disguising themselves as Causasian characters and men disguising themselves as women.  *Id.* at 45.  Even though the defendants' access to the plaintiff's screenplay was conceded, the court dismissed plaintiff's claims, ruling that these and other similarities between the works "were non-novel concepts used in the film industry long before plaintiff's authors drafted the screenplay", and parsing the use of such devices from the substantial similarity analysis.  *Id.* at 48.

The casting decision to have one actor play multiple roles is similarly a non-novel device, with a long history on both stage and screen.  As in *Willis*, the concept dates back to Greek tragedies,[9] and has since been used in countless plays and films, including theatrical works of Tony Kushner and Tom Stoppard, Buster Keaton in "The Play House" (1921), Sid Caesar in "Little Me" (1962), Peter Sellers in "Dr. Strangelove" (1964), and Eddie Murphy in numerous

---

[9] *See, e.g.*, Introduction to Greek Tragedy, http://ablemedia.com/ctcweb/netshots/tragedy.htm

films in the 1990s and 2000s.[10]  To observe that *Kind Hearts* was not the first, or the last, work to have one actor play multiple roles "does not strain the concept of judicial notice".  *Willis*, 2001 WL 1352916, at *2 (taking judicial notice that "books, movies and television series are full of such unethical men and women in a variety of businesses and . . . this is a not uncommon perception of talent agents").[11]

Plaintiff simply cannot claim copyrightable interest in actors playing multiple roles, and, as in *A Slice of Pie Productions*, any similarity resulting from this shared concept must be filtered out of the analysis in determining whether *Kind Hearts* and *Gentleman's Guide* are substantially similar.  *See, e.g.*, *Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 274 (S.D.N.Y. 2005) ("The discerning ordinary observer inquiry entails . . . a careful assessment of the total concept and feel of the works at issue, <u>after the non-protectible elements have been eliminated from consideration</u>.") (emphasis added, internal quotations omitted).  Rather, the casting of a single actor for multiple roles is best understood as "mere stage business," which cannot be copyrighted.  *Chappell & Co. v. Fields*, 210 F. 864, 865 (2d Cir. 1914).  Accordingly, any copyright infringement claim based on both works' employing one actor to portray multiple roles would lack merit as a matter of law.

---

[10] *See, e.g.,* Dual Role, Wikipedia, http://en.wikipedia.org/wiki/Dual_role(describing concept of "dual role," with examples);  List of Actors Who Play Multiple Roles, Wikipedia, http://en.wikipedia.org/wiki/List_of_actors_who_have_played_multiple_roles_in_the_same_film (list of actors who have played multiple roles in the same film); Little Me, Wikipedia, http://en.wikipedia.org/wiki/Little_Me_%28musical%29

[11] *See also, e.g., Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 12, 41 n. 71 (S.D.N.Y. 2001), *aff'd in part, rev'd in part on other grounds*, 277 F.3d 253 (2d Cir. 2002) (taking judicial notice of storyline in Star Wars film); *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 438 (S.D.N.Y. 1985), *aff'd*, 784 F.2d 44, 50 (2d Cir. 1986) (taking judicial notice that members of NYPD "are often portrayed as Irish, smokers, drinkers, and third or fourth generation police officers"); *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546-47 (S.D.N.Y. 2007) (taking judicial notice of novels written by third parties in the thriller genre, as well as the defendant's own prior novels, to determine whether alleged similarities between plaintiff's screenplay and defendant's novel were stock elements of the thriller genre or of defendant's own prior works).

**C.** **With the Unprotectible Elements Removed from Consideration, *Gentleman's Guide* is Not Substantially Similar to *Kind Hearts* as a Matter of Law**

In assessing "substantial similarity," courts consider such aspects of works as the "total concept and feel, theme, characters, plot, sequence, pace and setting." *Lewinson*, 659 F. Supp. 2d at 565. Again, however, dismissal of a copyright complaint is appropriate where any substantial similarity concerns only the non-copyrightable elements of the plaintiff's work. *See, e.g., Warner Bros. Inc. v. Am Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983); *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d. 526, 543 (S.D.N.Y. 2007); *Psihoyos*, 409 F. Supp. 2d at 274 (S.D.N.Y. 2005); *Green v. Lindsey*, 885 F. Supp. 469 (S.D.N.Y. 1992), *aff'd*, 9 F.3d 1537 (2d Cir. 1993).

As set forth above, the noncopyrightable elements identified in Plaintiff's Complaint do not give rise to an infringement claim. Once these elements are eliminated from consideration, Plaintiff is left with nothing other than the vague allegation that *Gentleman's Guide* adopts the "total concept and feel" of *Kind Hearts*. (Compl. ¶¶ 17, 20). However, a review of the subject works reveals that there is no substantial similarity between *Gentleman's Guide* and the protectible elements of *Kind Hearts*, as a matter of law.

**1.** **"Total Concept and Feel" and Theme**

Courts are mindful that "accepting an overly broad scope for protectable total concept and feel threatens the basic principle of copyright law: that concepts and ideas may not be copyrighted, and that only a particular expression of an idea may be copyrighted." *Lewinson*, 659 F. Supp. 2d at 576; *see also* 4 Nimmer on Copyright § 13.03[A][1][c] at 13-46 (2009) ("the touchstone of 'total concept and feel' threatens to subvert the very essence of copyright, namely the protection of original *expression*. 'Concepts' are statutorily ineligible for copyright protection."). Accordingly, a court conducting a substantial similarity analysis should engage in "a careful assessment of the total concept and feel of the works at issue, <u>after the non-protectible</u>

elements have been eliminated from consideration." *Psihoyos*, 409 F. Supp. 2d at 274 (S.D.N.Y. 2005) (emphasis added).

Any similarity in the "total concept and feel" of the two works at issue simply owes to the fact that both works are adaptations of the same Novel. Because neither the plot elements original to *Israel Rank* nor the idea of a humorous adaptation are protectible, such similarities do not make out a viable case of copyright infringement. As explained in *Lewinson*:

> [T]o the extent that the works are similar in their total concept and feel, these similarities stem from the fact that both works are aimed at a young audience, and convey the same general idea through depictions of discrete scenes of children in various countries stating the same word in a different language. This does not make out a viable case of copyright infringement.

659 F. Supp. 2d at 577.

Despite the similar source material and concept, there are significant differences between the overall feel of the two works. Whereas *Kind Hearts* is a subtle, dark, Wildean comedy, with some truly sinister scenes (such as the point-blank execution of the Duke of Chalfont (Film at 1:24:25 – 1:26:30)), *Gentleman's Guide* is a far lighter, broad comedy, filled with several bawdy scenes and riotous musical numbers. The musical elements which comprise a substantial portion of *Gentleman's Guide* lend significantly to this different concept and feel. (*See* Slotnick Decl. Ex. D).

Indeed, the total concept and feel of those portions of both works that depart from the source material are quite different. In the final third of the Film, Louis executes the Duke of Chalfont in cold blood and is betrayed by Sibella, who attempts to blackmail Louis, falsely accuses him of murdering her husband, and then attempts to manipulate him into murdering his wife. (*Supra* at 6-7). At the end of the Film, Louis is contemplating which of his two loves to murder, when he realizes that he had left his incriminating memoirs in his cell – the Film thus

ends with the strong understanding (explicit in the American version) that Louis' crimes will be exposed, and all that he had worked for will be undone. (*Supra* at 7).

The second act of *Gentleman's Guide* contrasts sharply with the dark tone of the latter portion of the Film. In the centerpiece of the second act, Monty, Phoebe and Sibella all visit the Earl's castle, where Monty, in a comic scene tries, and fails, to murder the Earl via poisoned trifle. Phoebe and Sibella ultimately work together to free Monty, who leaves prison a free man, with Phoebe and Sibella on each arm. (*Supra* at 9). There is simply no conceptual similarity between the latter portion of the Film, in which Louis is betrayed and contemplates murdering each of his love interests, and the second act of the Musical, in which Sibella and Phoebe join together to free him, and the group exits as a happy trio. These drastically different endings demonstrate that, to the extent the protectible elements of the works depart from the source material, the total concept and feel is not substantially similar. *See Porto*, 659 F. Supp. 2d at 615 ("One particularly striking point that underscores the substantially different feel between the two works is the differences between the endings of the works.").[12]

### 2.   Characters

Because *Israel Rank* is in the public domain, Defendants are free to use its characters. *See, e.g., Silverman*, 870 F.2d at 50 (plaintiff free to use public domain characters Amos 'n' Andy); *Pannonia Farms, Inc.*, 2004 WL 1276842, at *9 (S.D.N.Y. June 8, 2004) (defendant free to use public domain characters Sherlock Holmes and Dr. Watson). Here, every significant character that *Gentleman's Guide* has in common with *Kind Hearts* comes directly from *Israel Rank*. These include the protagonist; his love interests Sibella Hallward and Phoebe (Edith in the Novel and the Film); Lord Asquith D'Ysquith, the protagonist's employer and benefactor; the

---

[12] For similar reasons, there is no protectible similarity between the themes of the two works. While both works are based on the same source material and thus have a number of permissible plot similarities, the ultimate theme of *Kind Hearts* appears to be that "murder will out" and even the cleverest villain will be undone, while the theme of *Gentleman's Guide* is "crime pays".

murder victims Reverend Ezekial (Henry in the Novel and Film), Henry D'Ysquith, and Asquith D'Ysquith Jr. (and his mistress); and the Earl. (*See supra* at 3-5).[13]  With the possible exception of the Reverend, all of the foregoing are important characters in *Israel Rank,* and their inclusion in any adaptation is necessary in order to move the plot forward.  Because the characters are adapted from the same public domain work, they do not give rise to any "substantial similarity" between the two works as a matter of law.  *See, e.g., Porto,* 659 F. Supp. 2d at 615 (dismissing copyright infringement claim where, although "there are a number of characters shared by both works . . . all of these characters are dictated by the choice to tell" a story concerning the trial of biblical character Judas Iscariot).

Plaintiff can point to no characterizations of the above characters, unique to the film *Kind Hearts,* that is incorporated into *Gentleman's Guide.*  To the contrary, *Kind Hearts* and *Gentleman's Guide* often differ in their treatment of the common characters.  By way of example only, in *Kind Hearts* Henry is a young gentleman, and Edith is his charming but reserved, prohibitionist wife, who accepts Louis' proposal of marriage only after much thought.  (*See* Film at 33:17 – 36:34; 1:02:25 – 1:04:40; 1:08:10 – 1:10:21).  By contrast, in *Gentleman's Guide* Henry's relationship with the protagonist includes a homoerotic subtext, and Phoebe is not Henry's wife, but rather his impulsive sister, a feminist who proactively informs the protagonist that she has "decided to marry [him]" in a musical number.  (*See* Musical at 39-42, 45, 70-77).

In addition, there are many characters in *Gentleman's Guide* who do not appear in *Kind Hearts,* including the Barber (a character who originally appears in *Israel Rank*), Marietta Shingle, Lady Hyacinth, Lord Bartholemew, Lady Salome, Lady Eugenia and Nesmith D'Ysquith.  (*See* Musical at 2-10, 49-52, 55-58, 59-60, 79-84, 86-91, 95-96, 107).  There are also

---

[13] Other characters that the works arguably have in common, such as servants, a detective, the magistrate who tries the protagonist, the prison warden and guards, are mere stock characters, standard in the treatment of a given setting or topic, which are not subject to copyright protection.  *See, e.g., Lewinson,* 659 F. Supp. 2d at 567, 574.

characters from *Kind Hearts* who do not appear in the *Gentleman's Guide*, including Louis'

mother and Lionel Holland – two major characters in the Film – and several of Louis' murder

victims. (*See* Film at 6:53 – 20:37, 38:15 – 38:48, 1:01:41 – 1:02:24, 1:11:22 – 1:15:38). These

different characters underscore the lack of substantial similarity between the works. *See, e.g.,*

*Porto*, 659 F. Supp. 2d at 615.

### 3.  Plot, Sequence of Events and Setting

Any similarities in the plot, sequence of events, and setting of *Kind Hearts* and

*Gentleman's Guide* arise from the fact that both works derive from the same public domain

source material, and thus do not give rise to a claim of copyright infringement. *See supra* at 12-

14. *Gentleman's Guide* does not adopt a single plot point that is unique to *Kind Hearts*.

To the contrary, there are myriad differences between *Gentleman's Guide* and *Kind*

*Hearts*, particularly with respect to those elements unique to *Kind Hearts*.  Often, where *Kind*

*Hearts* departs from the source material – for example, making the character of Edith Henry's

wife, rather than his sister – *Gentleman's Guide* maintains the original plot elements of *Israel*

*Rank*. (*Supra* at 4-5, 6, 8).[14]  At other times, *Gentleman's Guide* departs significantly from both

*Israel Rank* and *Kind Hearts*; unlike the other works, the Musical skips the protagonist's

childhood entirely, and the entire second act is wholly different from either the Novel or the

Film. (*Supra* at 9). As set forth *supra* at 17-18, the nature of the murder scenes and identities

---

[14] Among other things, in both *Israel Rank* and *Gentleman's Guide*, the protagonist (not his mother)
writes to his eventual benefactor seeking a job, and his benefactor later sends an unsolicited letter to the
protagonist apologizing for his earlier rudeness. (Novel at 46, 81-85; Musical at 10, 14-15). *Kind Hearts*
revises these plot elements.  (Film at 11:27 – 13:33, 27:10 – 28:20).  In both the Novel and the Musical,
the protagonist informs Henry that they are related. (Novel at 103-11; Musical at 42-43).  In the Film,
however, Louis does not inform Henry of their relation, but instead tells Edith, in order to ingratiate
himself with her. (Film at 34:43 – 36:00).  In addition, in both *Israel Rank* and *Gentleman's Guide*, the
protagonist has a brief scare about leaving his memoirs in the prison cell, but this quickly passes. (Novel
at 311; Musical at 105-06).  In *Kind Hearts*, by contrast, Louis' leaving his incriminating memoirs
behind, and ultimately being exposed, is the climax of the Film. (Film at 1:45:10 – End; American
Ending).

and character of the victims differ between the works as well.  Such differences further undercut Plaintiff's claim of "substantial similarity."  *See, e.g., Porto*, 659 F. Supp. 2d at 614 ("While the differences between the works are not dispositive, 'numerous differences tend to undercut substantial similarity.'") (quoting *Warner Bros.*, 720 F.2d at 241).

   In summary, any similarity between the plot and events of *Kind Hearts* and *Gentleman's Guide* is the permissible result of both works being based on the same public domain novel, and related nonprotectible ideas and *scènes à faire.*  To the extent there are any discrete similarities to the original, protectible elements of *Kind Hearts*, they are de minimis and more than outweighed by the differences between the works.  *See Lewison*, 659 F. Supp. 2d at 573 ("[W]hile the dissimilarities between these scenes are many, the similarities between these scenes are at most de minimis, and more is required to meet the substantial similarity requirement."); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 627 (2d Cir. 1982) ("Naturally there are certain similarities required by Tarzan's character and the jungle setting, but on the whole the differences are sufficient to offset any similarities beyond that.").

### 4.    Pace

   Finally, similarity in "pace, without more, does not create an overall issue of substantial similarity between the works." *Williams*, 84 F.3d at 590.  In any case, there is no similarity between the pace of the two works, beyond the general plot accelerations necessary in adapting a novel to an audiovisual or theatrical work. *See Robinson v. Viacom Int'l, Inc.*, No. 93 Civ. 2539, 1995 WL 417076, at *11 (S.D.N.Y. July 13, 1995) (where the "pace of the two works [wa]s common to virtually all sitcoms," it was "not a protectible element of Plaintiffs' work.").  The numerous musical numbers in *Gentleman's Guide* alone result in a dramatically different pace than the Film, as events given short shrift in *Kind Hearts* – such as Louis' visit to the family

26

estate, an event which also occurs in the Novel (Novel at 62-68; Film at 20:42 – 21:23) – are given lengthier treatment in the Musical. (Musical at 16-21).

## II.

### PLAINTIFF'S BREACH OF CONTRACT CLAIM MUST ALSO BE DISMISSED

"The interpretation of an unambiguous contract is a question of law for the court, and the provisions of a contract addressing the rights of the parties will prevail over the allegations in a complaint." *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007) (citation omitted). Accordingly, on a motion to dismiss a breach of contract action, where plaintiff's factual allegations or legal conclusions are contradicted by the documentary evidence they are not presumed to be true or accorded favorable inference, *id.*, and "[w]here . . . it is clear as a matter of contractual interpretation that there has been no breach of contract under New York law, a breach of contract claim is properly dismissed on a motion to dismiss." *Jofen v. Epoch Biosciences*, No. 01 Civ. 4129 (JGK), 2002 WL 1461351, at *4 (S.D.N.Y. Jul. 8, 2002), *aff'd*, 62 Fed. App'x 410 (2d Cir. 2003).

Here, Plaintiff's breach of contract claim must be dismissed for the reasons set forth below.

### A.    Plaintiff's Breach of Contract Claim is Preempted by the United States Copyright Act

In essence, Plaintiff claims that Defendants have breached the Agreement by incorporating elements of *Kind Hearts* owned by Plaintiff into *Gentleman's Guide*. (Compl. ¶¶ 13-16). However, such a claim is plainly preempted by federal copyright law.

It is well-settled that a state law cause of action is preempted by the Copyright Act "if the subject matter of the state-law right falls within the subject matter of the copyright laws and the state-law right asserted is equivalent to the exclusive rights protected by the federal copyright law." *Kregos v. Associated Press*, 3 F.3d 656, 666 (2d Cir. 1993); *Price v. Fox Entm't Group,*

27

*Inc.*, 473 F. Supp. 2d 446 (S.D.N.Y. 2007); *see also* 17 U.S.C. § 301 (pre-emption provision). To avoid preemption, a state law claim must involve an "extra element," instead of or in addition to the acts giving rise to a copyright infringement claim, which makes that claim qualitatively different from copyright infringement. *Kregos*, 3 F.3d at 666. The Second Circuit takes a "restrictive view" of what constitutes an "extra element" sufficient to avoid preemption, *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d cir. 2004), and courts have repeatedly held that breach of contract claims based upon an alleged unauthorized use of copyrightable material do not encompass the required "extra element," and are preempted by the federal copyright laws. *See, e.g., BroadVision Inc. v. Gen. Elec. Co.*, No. 08 Civ.1489, 2008 WL 4684114, at *4 (S.D.N.Y. October 15, 2008); *Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 932 (S.D.N.Y. 1996); *Brignoli v. Balch Hardy and Scheinman, Inc.*, 645 F. Supp. 1201, 1204-06 (S.D.N.Y.1986).

Specifically, a breach of contract claim is preempted if it alleges a violation of one of the exclusive rights already protected by copyright law – "reproduction, adaptation, performance, distribution or display of a protected work" – and does not include the requisite "extra element" making it "qualitatively different from a copyright infringement claim." *BroadVision, Inc.*, 2008 WL 4684114, at *3 (quoting *Briarpatch*, 373 F.3d at 305); *Am. Movie Classics*, 922 F. Supp. at 931. Here, Plaintiff alleges that the Agreement has been breached because "defendants have failed to 'cease dealing in and with any materials written or created by [them] which represent, incorporate or embody the Film or any elements of the Film . . . ." (Compl. ¶ 23). There is no added element beyond those acts which, if proven, would constitute copyright infringement, and therefore this claim is preempted.

**B.      Any Claim that Defendants Are Barred From Including in The Musical Non-Protectible Elements of _Kind Hearts_ That Are Not Owned by Plaintiff is Contrary to the Plain Terms of the Agreement**

While not clear from the face of the Complaint, even Plaintiff claims that the Agreement

bars Defendants from incorporating into their Musical non-copyrightable elements from the

Film, this does not remove Plaintiff's breach of contract claim from the preemption bar. _See_

_Briarpatch_, 373 F.3d at 305 ("A work need not consist entirely of copyrightable material in order

to meet the subject matter requirement . . . ."); _Montz v. Pilgrim Films & Television, Inc._, No. 08-

56954, 2010 WL 2197421, at *3-4 (9th Cir. June 3, 2010) (claim of implied contract based on

purported promise not to exploit plaintiff's noncopyrightable ideas preempted by Copyright

Act); _Selby v. New Line Cinema Corp._, 96 F. Supp. 2d 1053, 1061-62 (C.D. Cal. 2000) (same).

In addition to being preempted, Plaintiff's breach of contract claim must fail because any

argument that the contract restricts Defendants' use of noncopyrightable material, not owned by

Plaintiff, is contrary to the plain and unambiguous language of the Agreement, and would not

suffice to avoid dismissal. _See, e.g., First Lincoln Holdings, Inc. v. Equitable Life Assurance_

_Soc'y_, 43 Fed. Appx. 462, 463-64 (2d Cir. 2002) (breach of contract claim that was inconsistent

with contract's terms properly dismissed). The opening sentence of the Agreement expressly

provided defendant Steven Lutvak[15] with "the exclusive authorization, to the extent of the

interests of Canal+ Image UK Ltd. . . . to adapt the Film . . . as a live stage musical presentation."

(Slotnick Decl. Ex. E, at 1). In other words, the Agreement only purported to convey to Mr.

Lutvak the right to adapt the limited aspects of _Kind Hearts_ that Plaintiff actually owns -- the

unique elements original to the Film. The Agreement further provides that, following

termination, "materials written or created by [Mr. Lutvak] which represent, incorporate or

embody the Film . . . shall be deemed to have reverted to [Plaintiff]." (_Id._ at 2). By definition,

---

[15] Defendant Robert Freedman is not a party to the Agreement (_see_ Slotnick Decl. Ex. E) and thus, at the very least, Plaintiff's breach of contract claim must be dismissed with regard to Mr. Freedman.

"to revert" means "[t]o return to a former condition" or "[t]o return to the former owner or his or her heirs." *American Heritage College Dictionary* at 1168 (3d ed. 1997); *see also Black's Law Dictionary* at 916 (6th ed. 1991) (defining "revert" as "to turn back, to return to"). Accordingly, the only elements of the Film that can be deemed to "revert" to Plaintiff upon termination – and the only elements that Mr. Lutvak is restricted from utilizing under the plain language of Agreement – are those elements that Plaintiff actually owns, *i.e.* the original elements of the Film that are subject to Plaintiff's copyright.

Any argument that the Agreement restricts Mr. Lutvak from utilizing "elements of the Film" regardless of whether such elements are actually owned by Plaintiff would deprive the "reversion" clause of any force or effect, and thus must be rejected as a matter of law. *See, e.g., Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.,* 111 F. Supp. 2d 450, 455-56 (S.D.N.Y. 2000) (finding that contract was clear and unambiguous, and dismissing plaintiff's breach of contract claim, where alternative interpretation "would violate the principle that meaning and effect should be given to all terms of a contract") (quoting *United Nat'l Ins. Co. v. Waterfront New York Realty Corp.,* 994 F.2d 105, 109 (2d Cir. 1993)); *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174 (1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract".). The plain meaning of "revert" is to "return to the former owner" (*supra*), and rights which Plaintiff never owned, such as rights to elements of *Israel Rank* that are in the public domain, cannot "revert" to Plaintiff. *See, e.g., Brooke Group v. JCH Syndicate 488,* 87 N.Y.2d 530, 534, 640 N.Y.S.2d 479, 482 (1996) ("The words and phrases used by the parties [to a contract] must . . . be given their plain meaning."); *Mazzola v. Cty. of Suffolk,* 143 A.D.2d 734-35, 533 N.Y.S.2d 297, 297 (2d Dep't 1988) ("[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.").

30

*Radio Today, Inc. v. Westwood One, Inc.*, 684 F. Supp. 68 (S.D.N.Y. 1988) is closely on point. There, the plaintiff argued that the parties' agreement obligated defendant to pay for its use not only of certain radio programs created by plaintiff, but also for the "format" of such programs. *Id.* at 71. The Court disagreed, noting that the agreement did not purport to grant rights in the "format", but only the "programs" themselves, and that the agreement further provided that after the term of the agreement "all right, title and interest in and to the Programs shall revert back to [plaintiff]." *Id.* Accordingly, the Court granted defendant's motion to dismiss the breach of contract action, ruling that the agreement between the parties did not obligate defendant to pay for its use of a "format" that was not part of the license. *Id.* Here, as in *Radio Today*, the Agreement authorized Mr. Lutvak to adapt the Film only "to the extent of the interests of [Plaintiff]" and did not purport to create additional rights beyond what Plaintiff actually owned, and the reversion language in the two contracts is virtually identical. Accordingly, the Agreement only restricts Mr. Lutvak from utilizing that which Plaintiff initially granted – those original elements of the Film actually owned by Plaintiff.

Further, while the Agreement, by its terms, only purports to license elements of the Film owned by Plaintiff, it should also be noted that any effort to contractually prohibit Defendants from using materials that Plaintiff does not own, such as nonprotectible ideas and public domain material derived from *Israel Rank*, would constitute an impermissible, and unenforceable, misuse of copyright. The doctrine of misuse of copyright "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office." *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 976-77 (4th Cir. 1990) (license agreement purporting to prohibit licensee from independently utilizing the idea expressed in licensor's copyright, and attempting to restrict the licensees' behavior for a period longer than the life of copyright itself, constituted

misuse of the copyright).[16]   Accordingly, even if there were any ambiguity in the Agreement –

which there is not – the license cannot be interpreted in a manner that impermissibly expand

Plaintiff's copyright beyond its lawful scope.  *N.L.R.B. v. Local 32B-32J Serv. Employees Int'l

Union*, 353 F.3d 197, 202 (2d Cir. 2003) ("[A]mbiguously worded contracts should not be

interpreted to render them illegal and unenforceable where the wording lends itself to a logically

acceptable construction that renders them legal and enforceable."); *Rice v. Hartford Life and

Accident Ins. Co.*, No. 5:08-CV-00347 (NPM/DEP), 2009 WL 982465 (N.D.N.Y. Apr. 13, 2009)

(granting motion for judgment on the pleadings and dismissing case where defendant's proposed

interpretation of purportedly ambiguous contract rendered the agreement legal and enforceable).

Before entering into the Agreement, defendant Lutvak, or anyone else for that matter,

was free to adapt a stage play from *Israel Rank*, so long as the play did not incorporate elements

original to *Kind Hearts*.   Nothing in the Agreement diminishes this right.   Rather, by its plain

terms, the Agreement only purported to convey to Mr. Lutvak the limited rights that Plaintiff

actually owns, and when the Agreement ended the only rights that "reverted" to Plaintiff were

the rights in such original and protectible elements of *Kind Hearts*.   Accordingly, any argument

that Defendants are barred from utilizing even aspects of the Film not owned by Plaintiff are

contrary to the Agreement's terms, and should be dismissed as a matter of law.

---

[16] *See also Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 521 (9th Cir. 1997) (license agreement purporting to restrict licensee from using competing products not owned by licensor constituted misuse of copyright); *Schloss v. Sweeney*, 515 F. Supp. 2d 1068, 1080-81 (N.D. Cal. 2007) (allegations that defendant attempted to restrain the use of noncopyrightable information in plaintiff's expressive work stated claim for copyright misuse); *Tamburo v. Calvin*, No. 94 C 5206, 1995 WL 121539 (N.D. Ill. Mar. 17, 1995) (contractual prohibition against producing competing product extended licensor's monopoly beyond limited scope afforded by copyright law, and constituted misuse of copyright).

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that Plaintiff's

Complaint be dismissed in its entirety.

Dated: New York, New York
       July 2, 2010

                              LOEB & LOEB LLP


                         By:_____
                              Barry I. Slotnick (BS-9796)
                              Jonathan Neil Strauss (JS-1090)
                              345 Park Avenue
                              New York, New York 10154-1895
                              (212) 407-4000

                              *Attorneys for Defendants*