UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CANAL+ IMAGE UK Ltd.,

Plaintiff,

-against-

STEVEN LUTVAK and ROBERT L. FREEDMAN,

Defendants.

10 Civ. 1536 (RJH)

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

The Court dismissed this action for copyright infringement and breach of contract on March 29, 2011. *See Canal+ Image UK Ltd. v. Lutvak*, 2011 WL 1158439 (S.D.N.Y. Mar. 29, 2011) (*Canal+ I*). Defendants Steven Lutvak and Robert L. Freedman ("Defendants") now move pursuant to Federal Rule of Civil Procedure 54(d)(2) for an award of attorney's fees under 17 U.S.C. § 505. For the reasons that follow, the motion is denied.

**BACKGROUND**

The Court assumes the parties' familiarity with the procedural history of this case and the prior decision of the Court on defendants' motion to dismiss.

Plaintiff Canal+ Image UK Ltd. ("Canal+") owns the copyright to the film *Kind Hearts and Coronets*, released by Ealing Studios in 1949 (the "Film"). The Film is adapted from Roy Horniman's 1907 novel *Israel Rank* ("the Novel"), which has passed into the public domain. The Novel is the story of an eponymous protagonist, the son of Jewish father and a noble mother whose marriage to a Jewish man caused her family, the Gascoynes, to disinherit her. Raised acutely aware of his disinheritance, and shunned by

his true family's banking house and his childhood love, the protagonist hatches a plan to murder the eight people between him and the family's noble title. As he carries out the plan, the protagonist joins the banking house and his increased stature and wealth enable him to have an affair with his former flame and marry the sister of one his victims. When the protagonist takes the final step and poisons Lord Gascoyne himself, he takes the title but is arrested for the crime. However, he is exonerated when a governess at the family's estate falsely confesses to the murder because she has fallen in love with the protagonist.

The Film tells essentially the same story as the Novel, with a few differences summarized in *Canal+ I*. The Film has become famous for the *tour de force* carried off by Sir Alec Guinness in playing each of the protagonist's victims. In its complaint, Canal+ alleged that "having all of the murder victims played by the same leading comic actor is central to the artistic expression of the Film" and "affects, and is inextricably intertwined with, not just the tone but all of the dramatic situations in the Film, including its 'total concept and feel.'" (Compl. ¶ 20.)

Defendants are a lyricist and a songwriter. On April 1, 2003, Canal+ and Defendants entered into a licensing agreement (the "Agreement") pursuant to which Canal+ provided Defendants with "the exclusive authorization, *to the extent of the interests of [Canal+]* . . . to adapt the Film . . . as a live stage musical presentation" until October 1, 2004. (emphasis added). On that date, Defendants were to provide Canal+ with all materials necessary for Canal+ to decide whether to produce the "live stage musical presentation." If Canal+ elected to do so, it would "have the sole right to enter into agreements to . . . present the Play with [Defendants] on terms to be negotiated in good faith." However, if Canal+ elected not to produce the play, the Agreement provided

that Defendants' "rights [t]hereunder shall immediately terminate" and Defendants "shall immediately thereafter cease dealing in and with any materials written or created by you which represent, incorporate or embody the Film or any elements in the Film, including without limitation the text, characters, and situations in the Film, all of which elements shall be deemed to have reverted to [Canal+]."

Defendants submitted the required materials pursuant to releases dated September 1, 2004 which incorporated the terms of the Agreement, but Canal+ decided not to produce Defendants' musical. (Garmise Aff. Exs. A, B.) However, Defendants proceeded with developing their adaption ("the Musical") which has appeared at workshops but not in any theater. According to Defendants, the musical was scheduled to run in the 2010-2011 season at the La Jolla Playhouse in La Jolla, California and Defendants were prepared to sign an agreement "with a producer, who was to fund a portion of the La Jolla production in exchange for . . . rights to subsequent productions of the Musical." (Dec. of S. Lutvak, Apr. 14, 2011 ("Lutvak Dec."), ¶¶ 4-5; Dec. of R. Freedman, Apr. 14, 2011 ("Freedman Dec."), ¶ 4.) However, Defendants contend that, after Canal+ filed its complaint, "the potential producer elected not to sign the proposed agreement" and the La Jolla Playhouse canceled the scheduled production. (*See* Lutvak Dec. ¶¶ 6-7; Freedman Dec. ¶ 5.)

On February 19, 2010, Canal+ filed suit for copyright infringement and breach of contract. Canal+ alleged that Defendants "have simply taken the same musical which they previously called *Kind Hearts and Coronets*, changed the title and the names of certain characters, made other immaterial changes, and have now announced a pre-Broadway commercial production of that musical." (Compl. ¶ 16.) In particular, Canal+

alleged that Defendants' musical "retained the central and most memorable expressive part of *Kind Hearts and Coronets*: the comedy inherent in having all eight of the aristocratic murder victims played by a single actor. . . ." (*Id.* ¶ 19.)

Defendants moved [18] under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim for which relief can be granted, or, in the alternative, for summary judgment pursuant to Rule 56(c). In a memorandum opinion and order dated March 29, 2009, the Court granted the motion. *See Canal + I*, 2011 WL 1158439. The Court dismissed the copyright claim on the ground that no reasonable jury could find the works substantially similar. *See id.* at *16. The Court dismissed the contract claim as preempted by the Copyright Act. *See id.* at *21.

On April 14, 2011, Defendants moved [43] pursuant to Federal Rule of Civil Procedure 54(d)(2) for an award of attorney's fees under 17 U.S.C. § 505.

## LEGAL STANDARD

"Section 505 of the Copyright Act provides that a district court may 'in its discretion . . . award a reasonable attorneys fee to the prevailing party' in a copyright action." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010) (quoting 17 U.S.C. § 505). "This fee-shifting provision is symmetrical: costs and attorney's fees are equally available to prevailing plaintiffs and defendants." *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006) (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)). Since "a successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright," "defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the

same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Id.* at 527.

"Prevailing plaintiffs and prevailing defendants are to be treated alike, but attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Id.* at 534. "There is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised. . . ." *Id.* (quotation marks omitted). "When determining whether to award attorneys fees, district courts may consider such factors as (1) the frivolousness of the non-prevailing party's claims or defenses; (2) the party's motivation; (3) whether the claims or defenses were objectively unreasonable; and (4) compensation and deterrence." *Bryant*, 603 F.3d at 144 (citing *Fogerty*, 510 U.S. at 534 n. 19).

Since "fee awards are at bottom an equitable matter," the Second Circuit has stated that "courts should not hesitate to take the relative wealth of the parties into account." *Shangold v. Walt Disney Co.*, 275 Fed.Appx. 72, 74 (2d Cir. 2008). However, the law in this Circuit is somewhat unsettled as to whether the parties' resources are relevant to whether fees should be awarded or only to the amount of fees the Court has already chosen to award. Some courts have stated that "[c]ourts assessing attorney's fee applications in copyright actions may consider the relative financial strengths of the parties in determining whether an award of fees is appropriate." *Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, 546 F. Supp. 2d 120, 132 (S.D.N.Y. 2008); *see also Leibovitz v. Paramount Pictures Corp.*, No. 94 Civ. 9144, 2000 WL 1010830, at *5 (S.D.N.Y. July 21, 2000). However, Judge Sweet has advanced the view that decisions which "have treated a financial disparity between the parties as a factor to be weighed in

determining whether an award should issue rather than simply the magnitude of such an award . . . . were premised on mistaken or opaque prior constructions of the holding in *Williams* [*v. Crichton*, No. 93 Civ. 6829, 1995 WL 449068 (S.D.N.Y. July 26, 1995)]". *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126, 2004 WL 728878, at *6 (S.D.N.Y. Apr. 6, 2004). Indeed, the court in *Williams* stated only that "[a]mong the relevant factors to be considered in determining *the amount* of an award under 17 U.S.C. § 505 is 'the relative financial strength of the parties.'" *Williams*, 1995 WL 449068, at *1 (emphasis added) (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)).[1] Hence Judge Sweet has taken the position "that financial disparities may be a factor considered in determining the magnitude of an award once it has been resolved that such an award is appropriate." *Penguin Books U.S.A., Inc.*, 2004 WL 728878, at *5.[2]

The role of other factors is far more settled. "The third factor—objective unreasonableness—should be given substantial weight." *Bryant*, 603 F.3d at 144. Hence "[s]ome courts within the Circuit have concluded that the objective unreasonableness of a claim is sufficient by itself to warrant the imposition of attorneys' fees." *Silberstein v.*

---

[1] The same was true in *Shangold v. Walt Disney Co.*, 275 Fed.Appx. 72, 74 (2d Cir. 2008), the most recent Second Circuit decision to address the issue. In *Shangold*, "neither party challenge[d] the district court's determination that the defendants' application for fees was reasonable"; the parties instead disputed the amount of the award. And the district court only considered the parties' resources in determining the amount. *See Shangold v. Walt Disney Co.*, No. 03 Civ. 9522, 2006 WL 2884925, at *1 (S.D.N.Y. Oct. 11, 2006) ("In deciding *the amount* of fees and costs to award, courts may consider a party's financial circumstances.") (emphasis added).

[2] The Court need not resolve the issue of whether the parties' financial resources are a proper consideration in determining whether to award fees in the first instance. Even taking into account the parties' resources, the Court finds that a fee award is not warranted for the reasons set forth below.

*Fox Entm't Group, Inc.*, 536 F. Supp. 2d 440, 443 (S.D.N.Y. 2008); *see also Crown Awards, Inc. v. Discount Trophy & Co., Inc.*, 564 F. Supp. 2d 290, 294 (S.D.N.Y. 2008) ("Objective unreasonableness of a party's claims or defenses is sufficient to subject a party to an award of attorneys' fees under § 505."). But while objective unreasonableness may be sufficient, it is not necessary to an award of attorney's fees. True, "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." *Matthew Bender & Co., Inc. v. West Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001). "This is not to say, however, that a finding of objective reasonableness necessarily precludes the award of fees. In an appropriate case, the presence of other factors might justify an award of fees despite a finding that the nonprevailing party's position was objectively reasonable." *Id.*

Nor is an award of fees limited to cases involving unreasonable claims. "If a party's *conduct* is unreasonable, a district court has the discretion to award fees." *Id.* at 124 (emphasis in original). However, an "award [that] essentially punishes [a party] for availing itself of a right provided by the Federal Rules" is an abuse of discretion, since "[t]o allow fees on this basis would be to deter the exercise of rights afforded to litigants in federal court." *Id.* at 126. Rather, a court has discretion to award fees where a motion is "frivolous, lacking any plausible merit. . . ." *Id.*

## DISCUSSION

### A. Plaintiff's Claim

Defendants argue that they "are entitled to attorneys' fees because [the] copyright infringement claim lacked both legal and factual support, and because its conduct in the course of pursuing such claim was unreasonable." (Defs.' Br. at 8.)

"'Objective unreasonableness' is generally used to describe claims that have no legal or factual support." *Viva Video, Inc. v. Cabrera*, 9 Fed. App'x 77, 80 (2d Cir. 2001). Objective unreasonableness is not the same as bad faith, which "is not a prerequisite to an award of fees." *Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47, 52 (S.D.N.Y. 1994). "Rather, the courts of this Circuit have generally concluded that only those claims that are clearly without merit or otherwise patently devoid of legal or factual basis ought to be deemed objectively unreasonable." *Silberstein*, 536 F. Supp. 2d at 444; *see also Porto v. Guirgis*, 659 F. Supp. 2d 597, 617-18 (S.D.N.Y. 2009) (same); *Contractual Obligation Prods., LLC*, 546 F. Supp. 2d at 125.

Defendants begin from the proposition that "Plaintiff never disputed that its Film was based on the public domain Novel. . . ." (Defs.' Br. at 8.) True, but that hardly settles whether the claim was objectively unreasonable. As Defendants themselves conceded in briefing their motion to dismiss, the plain language of the Copyright Act extends protection "for the incremental additions of originality contributed by the authors of the derivative works." *Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir. 1989). *Cf.* 17 U.S.C. § 103(b) ("The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting

material."). Thus the reasonableness of Canal+'s claim turns on the reasonableness of its assertion of rights to what the Film's creators added to the Novel or how they adapted it.

In that regard, Defendants argue that, "[r]ather than identify any specific, concrete similarities between the Musical and original elements of the Film, Plaintiff instead sought to claim ownership over the very idea of adapting *Israel Rank* in a humorous fashion, and the time-honored theatrical trope of having one actor play multiple roles." (Defs.' Br. at 9-10.) As to the former claim, Defendants are incorrect, since Canal+ conceded that "[w]hat is at issue is not that defendants turned *Israel Rank* into a comedy. . . ." (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 5.) Nor are Defendants quite correct that Canal+ "sought to claim ownership over . . . the time-honored theatrical trope of having one actor play multiple roles." (Defs.' Br. at 9-10.) As the Court recognized, Canal+ was arguing that "the creators of the Film transformed a dark, anti-Semitic novel into a comedy" by using a particular theatrical trope. *Canal + I*, 2011 WL 1158439, at *5 n.2 (quotation marks omitted). Put another way, Canal+ argued that "the composite victim is responsible for creating the total concept and feel of the Film," and that "the Musical uses the same device to tell the same story with the same feel." *Id.* at *11 (quotation marks omitted).

Defendants contend that "Plaintiff's argument that there is a substantial similarity between the total concept and feel of the two works at issue was based entirely on the shared, unprotectible idea of one actor playing multiple roles." (Defs.' Br. at 11.) Thus Defendants argue that "any claimed similarity in the 'total concept and feel' between the works was based on a mischaracterization of the works that elevated a single unprotectible concept and ignored all other aspects of the work (which revealed a

markedly different concept and feel)." (Defs.' Br. at 12.) It is true that the Court ultimately came to that conclusion. *See Canal + I*, 2011 WL 1158439, at *13 ("A film is a film because all the elements work together, but Canal+ asks the Court to examine just the device that is similar."); *id.* at *15 ("[B]oth works use the same device to transform an unprotectible idea, but both works also combine the device with other elements to create works that are comedic in different ways and for different reasons."). But the Court did not reach that conclusion so easily that future courts should be spared the effort.

"Because copyright law ultimately serves the purposes of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible." *Fogerty*, 510 U.S. at 527. "But because novel cases require a plaintiff to sue in the first place, the need to encourage meritorious defenses is a factor that a district court may balance against the potentially chilling effect of imposing a large fee award on a plaintiff, who, in a particular case, may have advanced a reasonable, albeit unsuccessful, claim." *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 75 (1st Cir. 1998). Hence "a court should not award attorneys' fees where the case is novel or close because such a litigation clarifies the boundaries of copyright law." *Earth Flag Ltd. v. Alamo Flag Co.*, 154 F. Supp. 2d 663, 666 (S.D.N.Y. 2001).

Canal+'s argument required the Court to analyze a somewhat novel question: can a work consisting almost entirely of unprotected elements be protected under the Copyright Act? Or, more specifically, can the decision to use one unprotected element to tell an unprotected story transform the telling into an original work? That question ran

down the fault line between two principles enunciated by the Court of Appeals in this Circuit.

"To prove infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Hamil Am. Inc. v. GFI,* 193 F.3d 92, 99 (2d Cir. 1999) (emphasis in original, quotation marks omitted). "Courts assessing whether two works are similar 'examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting'. . . ." *Canal+ I*, 2011 WL 1158439, at *5 (quoting *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)). That inquiry is somewhat more complicated with respect to a work consisting of both protectible and unprotectible elements. On the one hand, "copying is illegal because a substantial similarity exists between the defendant's work and *the protectible elements of plaintiff's*." *Canal+ I*, 2011 WL 1158439, at *4 (emphasis in original) (quoting *Hamil Am. Inc.,* 193 F.3d at 99). Accordingly, "where the allegedly infringed work consists of both protectible and unprotectible elements, the court 'must attempt to extract the unprotectible elements from its consideration and ask whether the *protectible elements, standing alone,* are substantially similar.'" *Canal+ I*, 2011 WL 1158439, at *4 (emphasis in original) (quoting *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir. 1995)).

On the other hand, however, because "all creative works draw on the common wellspring that is the public domain," *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,* 338 F.3d 127, 132 (2d Cir. 2003), "[c]onsidering only those elements that

alone are protectible 'would result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectible elements like letters, colors and symbols.'" *Canal+ I*, 2011 WL 1158439, at *4 (quoting *Boisson v. Banian, Ltd*, 273 F.3d 262, 272 (2d Cir. 2001)). Therefore, the Second Circuit "ha[s] disavowed any notion that '[courts] are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable,'" *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (quoting *Knitwaves, Inc.*, 71 F.3d at 1002). Instead, the Court of Appeals has instructed courts to be "principally guided 'by comparing the contested [work's] total concept and overall feel' with that of the allegedly infringed work, as instructed by [their] good eyes and common sense." *Gaito*, 602 F.3d at 66 (quoting *Tufenkian Imp./Exp. Ventures, Inc.*, 338 F.3d at 133).

As the Court observed in its opinion, these principles appear to be in tension: how can a court act as a "more discerning observer" and filter out unprotectible elements and at the same time be principally guided by total concept and feel? One explanation advanced in the Court's opinion is that the Second Circuit's emphasis on the total concept and feel inquiry is the result of applying to visual works a copyright doctrine developed with respect to works consisting of discrete elements. *See Canal+ I*, 2011 WL 1158439, at *12. Rather than jettison the more discerning observer test, the Second Circuit has simply reminded courts not to lose the forest for the trees with respect to visual works whose trees are, to a great degree, subsumed into the forest in which they appear. Yet as the Court noted, this medium-based explanation hardly crystallizes the substantial similarity inquiry with respect to motion pictures, since such works have some elements

of narrative works, with respect to which the more discerning observer test was developed, and some elements of visual works, with respect to which that test is somewhat misplaced. *See id.*

Of course, in the end, the Court concluded that while "Canal+'s emphasis on the so-called composite victim" had "some surface appeal," the device could not bear the full weight of substantial similarity in total concept and feel since other elements made the works materially different in that respect. *Id.* at *13-*15. Perhaps in hindsight it is easy to see that staking a copyright claim on "how the decision to portray characters in a story interacts with that story . . . . merely asks how parts have been acted," an element that is not protectible. *Id.* at *16. Yet "[t]his kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." *Roth v. Pritikin*, 787 F.2d 54, 58 (2d Cir. 1986) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978)). Even in hindsight, the Court has acknowledged that it "may initially appear odd" that "a famous film has very little copyright protection. . . ." *Canal+ I*, 2011 WL 1158439, at *16. Examining copyright principles and the nature of the film medium ultimately revealed that the Film's "creators' original contribution was limited to the way in which they employed the varied elements of cinema—themselves unprotectible—to put their interpretation of that story on the screen" and that "the scope of their copyright—and therefore their right to prevent others from unauthorized copying—extends only to works approximating a reproduction of the essential elements of the Film. . . ." *Id.* But the fact that Defendants' musical did not meet that description does not mean it was objectively unreasonable for Canal+ to argue that it did.

Indeed, Defendants' own actions suggest they once believed what Canal+ argued. Defendants entered into a licensing agreement for the very rights they now contend were obviously worthless. The Agreement provided Defendants with "the exclusive authorization, to the extent of the interests of [Canal+] . . . to adapt the Film . . . as a live stage musical presentation . . . ." If Canal+ elected not to produce the play, the Agreement provided that Defendants' "rights [t]hereunder shall immediately terminate" and Defendants "shall immediately thereafter cease dealing in and with any materials written or created by you which represent, incorporate or embody the Film or any elements in the Film, including without limitation the text, characters, and situations in the Film, all of which elements shall be deemed to have reverted to [Canal+]."

Signing this agreement "would appear to indicate that defendants themselves did not view plaintiff's copyright claims as specious." *Silberstein*, 536 F. Supp. 2d at 444. If Defendants knew that Canal+ would be objectively unreasonable in asserting any right to the musical for which they gave Canal+ an exclusive option, Defendants granted that option for nothing. Put another way, if "the infirmities in Plaintiff's claim were apparent from the outset" (Defs.' Reply at 6), Defendants missed them, too.

The Court doubts that Defendants were so foolish. It seems more likely that Defendants believed that Canal+ had some colorable claim to rights in the musical they had in mind and obtained a license to avoid liability for infringing those rights. Of course, Defendants might say that they signed the Agreement not because they feared that their musical would infringe but because they feared that Canal+ would force Defendants to expend extensive resources in defending against a claim of infringement, however objectively unreasonable such a claim might be. Yet if Defendants believed that Canal+

was committed to litigation by intimidation, it is hard to understand why Defendants would have limited themselves to producing the musical through Canal+—thereby incurring potential contractual liability—rather than shopping it around to other producers who might be more willing to take on the risk of suit or be powerful enough to make Canal+ think twice about bringing one. To the extent that other producers declined or would have declined to do so, that only suggests that they found the risk of liability more than negligible and corroborates the reasonableness of Canal+'s claim.

Against this background, it becomes clear that Defendants are asking for an exception to the usual rule that a party pays its own costs in a case involving litigation risks that are far from unusual. Defendants bought Canal+'s rights to a musical adaptation by giving Canal+ an exclusive option to produce it. Canal+ declined the option and Defendants decided to shop the musical around. That decision risked the very lawsuit that Defendants presumably sought to avoid in the first place and that Canal+ actually filed. In filing suit, of course, Canal+ took a risk that it would end up with nothing to show for its costs in prosecuting its claim. These kinds of risks are inherent in any litigation involving contested rights, and they seem particularly endemic to litigation involving copyrights whose scope turns on substantial similarity, a doctrine with respect to which "“[d]ecisions must . . . inevitably be *ad hoc*." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (Hand, J.).

It is useful to understand these risks in deciding whether to reverse the normal way that courts in this country have apportioned them. "Unlike Britain where counsel fees are regularly awarded to the prevailing party, it is the general rule in this country that unless Congress provides otherwise, parties are to bear their own attorney's fees."

*Fogerty*, 510 U.S. at 533. Despite this general rule, Congress has determined that awards of attorney's fees were appropriate in some cases so long as doing so is "faithful to the purposes of the Copyright Act. . . ." *Fogerty*, 510 U.S. at 534 n. 19. "The primary objective of the Copyright Act is to encourage the production of original literary, artistic, and musical expression for the good of the public." *Id.* at 524. For that reason, "the policies served by the Copyright Act are more complex, more measured, than simply maximizing the number of meritorious suits for copyright infringement." *Id.* at 526. Rather, "the monopoly privileges that Congress has authorized, while 'intended to motivate the creative activity of authors and inventors by the provision of a special reward,' are limited in nature and must ultimately serve the public good." *Id.* (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984)). *See also Fogerty*, 510 U.S. at 526 ("The limited scope of the copyright holder's statutory monopoly . . . reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.") (ellipsis in original) (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)).

Defendants argue that these purposes would be served by an award of attorney's fees because Defendants "spent years creating an original, musical play . . . and were scheduled to commence a commercial production of that Musical, until the filing of this lawsuit caused the potential producer to withdraw an offer to option the Musical, and the La Jolla Playhouse to pull the Musical from its schedule." (Defs.' Br. at 4.) Yet where Defendants spent most of those years working under a license they purchased to avoid the

very lawsuit that was ultimately filed against them, their equitable plea strikes something of a false note. The fact that Defendants walked away from the Agreement did not prevent the Court from agreeing that Defendants never needed the Agreement in the first place. That fact does, however, prevent the Court from agreeing that the Canal+s of the world must be deterred from defending rights that once commanded a price. It may be that authors who spend years adapting a public domain work deserve some protection from large media companies who attempt to extort a share in their big break. But the Copyright Act does not require insulating authors from the risks attendant to asserting that rights they once thought were worth buying are now worthless.[3]

**B. Plaintiff's Conduct**

Defendants argue that "Plaintiff's filing of an objectively unreasonable copyright infringement claim was compounded by its improper conduct and litigation tactics in pursuit of that claim. . . ." (Defs.' Br. at 12.) "[B]ad faith in the conduct of the litigation is a valid ground for an award of fees." *Matthew Bender & Co., Inc.*, 240 F.3d at 125; *see also id.* at 126 ("Misconduct before or during litigation can, in appropriate cases,

[3] None of the decisions cited by Defendants involved a fee award to a defendant who had previously purchased a license of the rights a court later determined did not extend to the alleged infringing work. *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, No. 99 Civ. 9623, 2009 WL 4276966, at *9 (S.D.N.Y. Nov. 30, 2009) involved several agreements, but the claims there were dismissed on the ground that those agreements gave defendants title to the copyrights at issue, not on any infringement analysis. *See Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, No. 99 Civ. 9623, 2007 WL 1040809, at *16 (S.D.N.Y. Apr. 4, 2007). *Torah Soft Ltd. v. Drosnin*, No. 00 Civ. 5650, 2001 WL 1506013 (S.D.N.Y. Nov. 27, 2001) also involved a contract between the plaintiff software developer and the defendant author. However, the contract was for the purchase of software in consideration for crediting the plaintiff in the defendant's book; it was not a license of rights. *See Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 281 (S.D.N.Y. 2001). And *Matthew Bender & Co., Inc. v. West Publishing Co.*, 240 F.3d 116 (2d Cir. 2001) involved only correspondence between the parties about the extent of their rights, not a license. *See id.* at 119.

provide the basis for an award of fees."). Where a motion is "frivolous, lacking any plausible merit, an award of attorneys' fees may [be] an appropriate sanction." *Id.* As the reference to "any *plausible* merit" suggests, and as the Second Circuit has elsewhere defined bad faith, the term is somewhat different than objective unreasonableness. "In order to award bad faith fees, the district court must find that the losing party's claim was (1) meritless; *and* (2) brought for improper purposes such as harassment or delay." *Kerin v. United States Postal Service*, 218 F.3d 185, 190 (2d Cir. 2000) (emphasis added). "The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice." *Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985).[4]

Defendants advance three reasons why Canal+'s conduct of the litigation was in bad faith. First, Defendants argue that Canal+ "filed a baseless motion seeking to disqualify Loeb & Loeb LLP . . . from representing Defendants in this matter, based on the fact that Richard Garmise, Plaintiff's transactional counsel and a former Loeb & Loeb attorney, drafted contracts purportedly at issue in this litigation." (Defs.' Br. at 12.) Specifically, Defendants argue that Canal+ "entirely ignored the applicable Rule of Professional Conduct (which provides that a firm should not be disqualified when the conflicted attorney is no longer employed by the firm), relied on inapplicable rules and case law which relate to imputation of conflicts to an attorney's *current* (not former firm), and completely failed to present any evidence that Loeb & Loeb attorneys possess material confidential information." (Defs.' Reply at 10 (emphasis in original).)

[4] The cases did not involve the Copyright Act. However, there appears no reason why the meaning of "bad faith" in the context of attorney's fees would turn on the cause of action, or why the meaning of "bad faith" in prosecuting copyright claims has some particular meaning.

Defendants make a strong argument that the disqualification motion was meritless. Under the approach taken by courts in this Circuit, "disqualification is warranted only if 'an attorney's conduct tends to taint the underlying trial.'" *GSI Commerce Solutions, Inc. v. BabyCenter, LLC*, 618 F.3d 204, 209 (2d Cir. 2010) (quoting *Bd. of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). In assessing taint, "the lodestar of the law of disqualification," *United States Football League v. National Football League*, 605 F. Supp. 1448, 1464 (S.D.N.Y. 1985), "the American Bar Association and state disciplinary codes provide valuable guidance. . . ." *GSI Commerce Solutions*, 618 F.3d at 209.[5]

Canal+ moved to disqualify Loeb & Loeb on the ground that Garmise, a former Loeb & Loeb attorney who took Canal+ with him when he left the firm, drafted the Agreement. New York Rule of Professional Conduct 1.10 appears to govern the situation where a firm represents a client adverse to a client of a former member of the firm. Rule 1.10 provides:

> When a lawyer has terminated an association with a firm, the firm is prohibited from thereafter representing a person with interests that the firm knows or reasonably should know are materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm if the firm or any lawyer remaining in the firm has information protected by Rule 1.6 or Rule 1.9(c) that is material to the matter.

Under Rule 1.6, to which Rule 1.9(c) also refers, "'[c]onfidential information' consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential.'" Accordingly, disqualification of Loeb & Loeb on the ground that

[5] Local Civil Rule 1.5(b)(5) binds attorneys appearing before this court to the New York Rules of Professional Conduct. *See* Local Civ. R. 1.5(b)(5).

Garmise represented Canal+ prior to leaving the firm would have been warranted only if current Loeb & Loeb attorneys possessed confidential information that would "taint" the underlying trial.

Defendants appear correct that Canal+ did not show that any Loeb & Loeb attorney possessed such information. The most Canal+ could marshal in support of its motion were Garmise's conclusory assertions that (1) he and Seth Gelblum, a current Loeb & Loeb partner, had worked on licensing to others the stage rights to the Film; (2) that he and Gelblum had discussed the Agreement with Defendants; and (3) that he had discussed other Canal+ matters with other Loeb & Loeb attorneys. None of these assertions establishes "taint," particularly where Defendants demonstrated that no attorney other than Garmise billed Canal+ for drafting the Agreement and submitted affidavits from current Loeb & Loeb attorneys averring that no attorney currently at the firm who worked on peripherally related matters was in possession of any confidential information.

Nevertheless, "meritlessness alone" will not suffice. *Sierra Club*, 776 F.2d at 390. Defendants must also show that the disqualification motion was "brought for improper purposes such as harassment or delay," *Kerin*, 218 F.3d at 190, or was "frivolous, lacking any plausible merit." *Matthew Bender & Co., Inc.*, 240 F.3d at 126. In this regard, the Court is troubled by several aspects of Canal+'s motion. *First*, when Defendants pointed out that Canal+ had based its motion on a Rule of Professional Conduct that governs disqualification of attorneys currently associated in a firm, Canal+ did not even martial a reply. *Second*, Canal+'s brief and Garmise's affidavit in support of the motion averred that Canal+'s "executives are outraged . . . that its former counsel

has, as they see it, turned against them. . . ." (Pl.'s Br. at 11; Garmise Dec., June 17, 2010, ¶ 5A.) Indeed, in an effort to assuage any concern that the motion was "made for tactical reasons," Garmise averred that "this motion is being made solely at the behest of an outraged client, which cannot understand how a large Manhattan law firm that took hundreds of thousands of dollars in fees from it until only a few years ago, can now present itself on the opposite side of one of the precise matters on which it took those fees." (*Id.* ¶ 23.) Together, these facts provide some support for an inference that Canal+'s motion—one that was unrelated to the merits of the dispute—was made to punish Loeb & Loeb for what Canal+ viewed as payback for taking its business to Garmise.[6]

However, for several reasons, the Court is not convinced that Canal+'s motion crossed the line from misguided to frivolous. *First*, citing an incorrect rule of law is as consistent with a mistake as a maneuver. *Second*, even under Rule of Professional Conduct 1.10, a "court must presume that the rights of the former client are jeopardized by [Loeb & Loeb]'s subsequent representation of" the former client. *Solow v. W.R. Grace & Co.*, 83 N.Y.2d 303, 313 (1994). Indeed, Defendants cited this case as "directly on point" in their motion, though they omitted any reference to the New York Court of Appeals's discussion of the presumption. (Defs.' Disqualification Opp'n at 14.) True, Loeb & Loeb was "allowed to" and seemingly did "rebut that presumption by facts establishing that the firm's remaining attorneys possess no confidences or secrets of the former client." *Solow*, 83 N.Y.2d at 313. But the existence of the presumption weakens

---

[6] That distinguishes the disqualification motion from the motion to dismiss at issue in *Matthew Bender & Co., Inc.*, 240 F.3d at 126, where the Second Circuit reversed a fee award that, in its view, "essentially punishe[d] [a party] for availing itself of a right provided by the Federal Rules. . . ."

any inference of frivolousness to be drawn from Canal+'s scant evidence in support of the motion.

*Third*, it is not the case that Canal+ adduced nothing in support of its claim. Garmise averred under oath that Gelblum understood the position Canal+ was taking in negotiating the Agreement and that he was generally aware of the Agreement. (Garmise Dec. ¶¶ 19, 21.) That these statements were essentially uncorroborated does not change the fact that this was not a case where Canal+ moved for disqualification without taking the time to collect evidence and place it before the Court.

*Fourth*, the Court shares Canal+'s sense that it is passing strange that a firm which represented one party in negotiating a contract could represent the other party in a suit for breach of that contract. Of course, the Second Circuit has held that "the appearance of impropriety is simply too slender a reed on which to rest a disqualification motion except in the rarest of cases." *Nyquist*, 590 F.2d at 1247. But the Court cannot say that it was frivolous for Canal+ to argue that this case fell into that category. Indeed, Defendants have not called the Court's attention to any other case where a firm has represented a client in a suit for breach of a contract that the firm negotiated for another party. Hence such a representation in this case jumps out from the page with respect to the contract claim. Considered through that lens, the disqualification motion—unlike the other reasons that Defendants have advanced—has very little to do with the reasons why Defendants are a "prevailing party" in this action. In those circumstances, the Court is

hard pressed to conclude that an award of attorney's fees with respect to the disqualification motion would advance the purposes of the Copyright Act.[7]

In the end, Defendants' request for an award of fees based on Canal+'s disqualification motion presents a close question. The question is particularly close because "the party seeking disqualification must meet a heavy burden of proof in order to prevail," *Amusement Industry, Inc. v. Stern*, 657 F. Supp. 2d 458, 460 (S.D.N.Y. 2009), and because Canal+ had the benefit of consulting with Garmise, the lead attorney with respect to the Agreement, to ascertain in advance whether any other Loeb & Loeb attorneys had any confidential information. Indeed, Canal+ hardly could have found it surprising that there was little evidence that any other attorney at Loeb & Loeb had such confidential information given that Canal+ took all of its Loeb & Loeb business to Garmise. The fact that Canal+ apparently believed that Garmise could do the work on his own suggests that, to a large degree, Canal+ understood that Garmise was already doing so. If that is so, Canal+ had little reason to believe that others at Loeb & Loeb were privy to its confidential information.

On the other hand, however, it is instructive to consider how this case is different from *Agee v. Paramount Communications, Inc.*, 869 F. Supp. 209 (S.D.N.Y. 1994), a copyright case in which the court awarded attorney's fees incurred in responding to motion to disqualify defense counsel where "[i]t was obvious to th[e] court that plaintiff's

[7] The Court is not unaware that it ultimately dismissed the contract claim as preempted by the Copyright Act. But given the well-documented and long-standing split in authority in this district on the issue, *see Canal+ I*, 2011 WL 1158439, at *17, Defendants can hardly claim that Canal+ had no good faith reason to believe that its contract claim would survive. In that case, taking into account the contract claim seems warranted in assessing whether Canal+ acted in bad faith at the time it moved to disqualify Defendants' counsel.

motion . . . was without evidence to support any reasonable demonstration of a conflict and that it was brought to harass defendants and escalate the costs of litigation." *Id.* at 12. For the foregoing reasons, it is not "obvious" to the Court that Canal+'s motion was "frivolous, lacking any plausible merit." *Matthew Bender & Co., Inc.*, 240 F.3d at 126. What is more, in *Agee*, "[i]n addition to bringing the motion to disqualify, plaintiff obtained an *ex parte* Temporary Restraining Order (TRO) under, at best, dubious circumstances." *Agee*, 869 F. Supp. at 211. "Plaintiff did not notify defendants' counsel" of his intent to move for a TRO and "failed to inform [the court] that Paramount had pledged not to rebroadcast that particular episode" after informing the Court that Paramount intended to do just that. *Id.* "When the deception was discovered and [the court] informed of the true facts, the order was vacated a mere three hours after it had taken effect." *Id.* Defendants do not contend that Canal+ engaged in any such deception. While deceiving the court is not a prerequisite to an award of fees, the contrast between this case and *Agee* suggests that Canal+ and its counsel filed a bad motion, not that they filed the motion in bad faith.

Defendants advance two other reasons why Canal+ acted in bad faith. Defendants argue that Canal+ improperly relied on an "expert" affidavit despite clear Second Circuit case law that such testimony is irrelevant to the question of substantial similarity. (*See* Defs.' Br. at 14.) Defendants are correct that "[t]he well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992). However, the Court is not persuaded that the expert report here "delay[e]d resolution of the case" or materially "increase[ed] defendants' costs." *Hudson*

*v. Universal Studios, Inc.*, No. 04 Civ. 6997, 2009 WL 536564, at *3 (S.D.N.Y. Mar. 4, 2009). Plaintiffs' reliance on their purported expert did not necessitate any additional motion practice and Defendants were never forced to take the purported expert's deposition or hire their own expert. Rather, Defendants dispensed with the expert issue in one and a half pages of their reply brief on the motion to dismiss already being briefed. In those circumstances, a fee award is unwarranted.

Finally, Defendants argue that "as a result of the lack of authority supporting its position, throughout its opposition brief Plaintiff was forced to mischaracterize caselaw and rely on irrelevant evidence in an effort to support its claims." (Defs.' Br. at 14.) Perhaps so, but the propriety of a fee award under the Copyright Act turns on the reasonableness of a party's claim, not on the reason with which counsel has argued it. The Court has already rejected the argument that the claim here was objectively unreasonable. In that circumstance, awarding attorney's fees on the ground that defense counsel was compelled to point out the inadequacies of his adversary's brief would smuggle the British Rule into the Copyright Act when the Supreme Court has already banished it from the realm. *See Fogerty*, 510 U.S. at 534 ("Thus we reject . . . petitioner's claim that § 505 enacted the British Rule for automatic recovery of attorney's fees by the prevailing party.").

## CONCLUSION

For the foregoing reasons, Defendants' motion **[43]** pursuant to Federal Rule of Civil Procedure 54(d)(2) for an award of attorney's fees under 17 U.S.C. § 505 is DENIED.

SO ORDERED.

Dated: New York, New York
June 8, 2011

Richard J. Holwell
United States District Judge